490  ESTATE OF LEONARD E. WHITLOCK, DECEASED, GEORGIA M. WHITLOCK, EXECUTRIX, AND GEORGIA M. WHITLOCK, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 386–70.   Filed December 29, 1972.

*R. Eugene McGannon* and *Philip J. Erbacher,* for the petitioners.
*Edward G. Lavery,* for the respondent.

### OPINION

FORRESTER, *Judge:* Respondent determined deficiencies in petitioners' income tax of $25,106.64, $1,552.76, $17,328.88, and $141,985.23 for the taxable years 1963, 1964, 1965, and 1967, respectively. The main issue we must decide is whether petitioners, who, for the taxable years 1964, 1965, and 1967, were U.S. shareholders subject to tax under section 551(b) [1] on income of a controlled foreign corporation, were required to include in gross income for such taxable years any amounts under section 951(a) with respect to such corporation. In addition, we must pass upon the constitutionality of the tax imposed on an amount equal to petitioners' pro rata share of their controlled foreign corporation's increase in earnings invested in U.S. property. Finally, we must decide whether respondent's determination

---

[1] Unless otherwise specified all statutory references are to the Internal Revenue Code of 1954.

of a deficiency for the taxable year 1963 was barred by the statute of limitations.

All of the facts have been stipulated and are so found. The stipulation and all exhibits attached thereto are incorporated herein by this reference.

During the years involved in this proceeding Leonard E. Whitlock and Georgia M. Whitlock were husband and wife residing in Stafford, Kans. Leonard E. Whitlock died on October 11, 1967, while a resident of Stafford, Kans. On January 5, 1968, Georgia M. Whitlock, his widow, was duly appointed executrix of the Estate of Leonard E. Whitlock by the Probate Court of Stafford County, Kans. At all times since then she has acted in that capacity, and is the duly qualified and still acting executrix of the Estate of Leonard E. Whitlock. At the time she filed the petition in this case, she resided in Stafford Kans. For convenience, we shall hereinafter sometimes refer to Leonard E. Whitlock and Georgia M. Whitlock as Leonard and Georgia, or, simply, petitioners.

Petitioners filed joint Federal income tax returns for the calendar years 1963 and 1964 with the district director of internal revenue in Wichita, Kans., and filed a joint Federal income tax return for the calendar year 1965 with the district director of internal revenue in Dallas, Tex. After Leonard's death, Georgia filed a joint Federal income tax return for the taxable year 1967 for Leonard E. Whitlock, deceased, and Georgia M. Whitlock with the district director of internal revenue in Wichita, Kans. All of these returns were filed on the cash basis.

During the years 1963 through 1967, Leonard (until the time of his death) and Georgia were both U.S. citizens.

Whitlock Oil Services, Inc. (hereinafter referred to as Oil Services), was a foreign corporation incorporated under the laws of the Republic of Panama. For each of its taxable years 1963 through 1967, Oil Services' taxable year was the calendar year.

During 1963 and 1964, petitioners, as joint tenants with right of survivorship, owned all of Oil Services' stock. During the first half of 1965 Leonard relinquished all of his interest in Oil Services' stock, and thereafter, during the last half of 1965, all of 1966, and all of 1967, Georgia held all of Oil Services' stock.

At a point during the years 1963 through 1967, Oil Services acquired and, at the end of each year noted, held U.S. property (as defined in section 956(b)) having adjusted bases as follows:

| | 1963 | 1964 | 1965 | 1966 | 1967 |
|---|---|---|---|---|---|
| Obligations of U.S. persons— accounts receivable: | | | | | |
| Whitlock & Associates, Inc. | | $5,125.00 | | | |
| L. E. Whitlock | | 21,211.52 | | | |
| L. E. Whitlock Truck Services, Inc. | $1,153 | 1,153.00 | $1,153.00 | $1,153.00 | $1,153.00 |
| B. I. Whitlock | | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 |
| Cotina Corp | | 317.50 | 8,650.57 | 8,650.57 | 8,650.57 |
| International Veneer | | | 11,489.24 | 11,489.24 | 11,489.24 |
| W. M. Baier, Jr. | | | | 2,000.00 | 2,000.00 |
| Dinastatco | | | | | 95,135.85 |
| AWB Manufacturing Co. | | | | | 131,547.93 |
| Obligations of U.S. persons—notes receivable: | | | | | |
| L. E. Whitlock | | | 15,422.51 | 15,422.51 | 15,422.51 |
| Henry Zipf | 2,500 | 2,500.00 | | | |
| Whitlock & Associates, Inc. | | | 188,319.43 | 188,319.43 | 186,816.98 |
| Stock of a domestic corporation: | | | | | |
| Cotina Corp | 10,000 | 10,000.00 | | | |
| Totals | 13,653 | ¹ 41,307.02 | 226,034.75 | 228,034.75 | ² 453,216.08 |

¹ Of this amount, petitioners, as shown on a schedule attached to their 1964 return, actually included $16,323.41 in their 1964 gross income.

² Of this amount, petitioners, as shown on a schedule attached to their 1967 return, actually included $548.49 in their 1967 gross income.

At the end of each of the years 1963 through 1967, Oil Services' retained earnings and profits (computed with reference to section 1.956–1(b), Income Tax Regs.) were sufficient in amount so that they did not limit the amounts, if any, otherwise includable in petitioners' gross income under section 951(a), if such section is applicable. The aforesaid earnings and profits were accumulated prior to 1963, except to the extent of the following amounts:

1. Earnings and profits accumulated in 1963 _____ $26,459.99
2. Earnings and profits representing undistributed foreign personal holding company income and excludable from earnings and profits under sec. 1.956–1(b), Income Tax Regs., for the year:

    (a) 1964 _____ 6,865.08
    (b) 1965 _____ 17,997.49
    (c) 1966 _____ 11,024.65
    (d) 1967 _____ 14,633.07

Prior to 1964, Oil Services had never been a foreign personal holding company within the meaning of section 552, nor had its shareholders included in gross income any amount under section 551 with respect to that corporation. However, during the years 1964 through 1967, Oil Services was a foreign personal holding company as defined in section 552.

For the periods listed below Oil Services derived gross income as follows:

| Gross income | Jan. 1, 1964–<br>Nov. 30, 1964 | Dec. 1, 1964–<br>Dec. 31, 1965 | Jan. 1, 1967–<br>Dec. 31, 1967 |
|---|---|---|---|
| Interest | $6, 865. 08 | $17, 997. 49 | $18, 501. 55 |
| Miscellaneous | 425. 00 | | |

In computing Oil Services' foreign personal holding company income for 1967 petitioners deducted $4,786.04 under section 954(b)(5), as deductions allocable to the $18,501.55 of interest income for that year. Of the $4,786.04 deducted $3,868.48 represented "Federal income tax."

For the years 1964 through 1967 Oil Services had undistributed foreign personal holding company income which consisted entirely of interest of a type not described in section 954(c)(3) or 954(c)(4), and which was includable in petitioners' gross income under section 551 as follows:

| Year | Undistributed foreign personal holding company income includable in petitioners' gross income under sec. 551 |
|---|---|
| 1964 | $6, 865. 08 |
| 1965 | 17, 997. 49 |
| 1966 | 11, 024. 65 |
| 1967 | 14, 633. 07 |

In their 1967 Federal income tax return petitioners included $13,715.51 in gross income under section 551.

If sections 951 and 956(a) may be constitutionally applied to this case (which application petitioners deny), the following amounts would have been included in petitioners' gross income for the taxable year 1963 as their pro rata share of Oil Services' increase in earnings invested in U.S. property:

| | |
|---|---|
| Account receivable from L. E. Whitlock Truck Services, Inc. | $1, 153 |
| Note receivable from Henry Zipf | 2, 500 |
| Cotina Corp. stock | 10, 000 |
| | 13, 653 |
| Less: Current and previously taxed subpart F income | 0 |
| Total amount includable in petitioners' gross income | 13, 653 |

The aforesaid amount, which petitioners omitted from gross income on their 1963 joint Federal income tax return, is in excess of 25 percent of the amount of gross income stated in that return.

Pursuant to section 6501(c)(4) petitioners (or their duly authorized representatives) and respondent timely consented in writing to extend the period of limitations for the years 1964 and 1965 to June 30, 1970.

The parties did not enter into such a consent for 1963. Petitioners filed their 1963 joint Federal income tax return on or about April 15, 1964. The statutory notice of deficiency in this case was sent to petitioners by certified mail on December 30, 1969.

Attached to petitioners 1963 joint income tax return was an "Information Return with Respect to Controlled Foreign Corporations" (Form 2952, rev. Dec. 1963). Accompanying that information return was Oil Services' balance sheet as of December 31, 1963. The assets listed on the balance sheet were as follows:

| | |
|---|---|
| Cash on hand and in banks | $163, 751. 59 |
| Notes receivable | 47, 077. 49 |
| Accounts receivable | 181, 924. 88 |
| Accrued interest receivable | 17, 659. 84 |
| Prepaid insurance | 924. 28 |
| Investment in common stocks | 257, 500. 00 |
| Automobile (net of depreciation) | 2, 777. 14 |
| Airplane (net of depreciation) | 26, 085. 59 |
| | 697, 700. 81 |

There was no indication on the information return or on any other statement attached to petitioners' 1963 joint income tax return that any of the above-listed assets constituted obligations of U.S. persons or stock of a domestic corporation, nor was there any listing of Oil Services' assets as of the beginning of 1963.

In general the statutory framework of the Internal Revenue Code of 1954 does not reach out to tax the foreign-source income of a foreign corporation. See Bittker & Ebb, United States Taxation of Foreign Income and Foreign Persons 338 (1968). However, where such a corporation is controlled by U.S. interests, the corporation's U.S. shareholders may, under the statute, be obliged to include all or part of the corporation's income and earnings as their own. The foreign personal holding company provisions of sections 551 through 558 and the controlled foreign corporation provisions of sections 951 through 964 (hereinafter referred to as subpart F) define two areas where a foreign corporation's income may be attributed to its U.S. shareholders.[2]

### 1. *Taxable Years 1964, 1965, and 1967*

The principal question in this case involves the interrelation of the complex foreign personal holding company provisions with the even more complex provisions of subpart F.

---

[2] It should be emphasized that in both subpart F and the foreign personal holding company provisions U.S. shareholders are taxed on their proportionate shares of various items. Since in the present case one or both of petitioners owned all of Oil Services' stock for the relevant years here, it is unnecessary for our discussion to speak in terms of proportionate shares.

For the years 1964, 1965, and 1967, Oil Services was both a foreign personal holding company as that term is defined in section 552(a) [3] and a controlled foreign corporation as that term is defined in section 957(a).[4] Oil Services' only shareholders, and, more particularly, its only U.S. shareholders, during 1964 and the first half of 1965 were petitioners Leonard and Georgia. During the remainder of 1965 and on through 1967 Oil Services' sole shareholder and only U.S. shareholder was petitioner Georgia.[5]

Section 551(a) provides that the undistributed foreign personal holding company income of a foreign personal holding company shall be included in the gross income of the foreign personal holding company's U.S. shareholders in the manner and to the extent set forth in sections 551 through 558. A foreign personal holding company's undistributed foreign personal holding company income is defined as the foreign personal holding company's taxable income adjusted in the manner provided in section 556(b), minus the dividends paid deduction as defined in section 561. Sec. 556(a).

For the years 1964, 1965, and 1967, Oil Services' undistributed foreign personal holding company income (which consisted entirely of interest income) was almost equal to its foreign personal holding company income.[6] Accordingly under section 551(b) petitioners were

---

[3] SEC. 552. DEFINITION OF FOREIGN PERSONAL HOLDING COMPANY.

(a) GENERAL RULE.—For purposes of this subtitle, the term "foreign personal holding company" means any foreign corporation if—

(1) GROSS INCOME REQUIREMENT.—At least 60 percent of its gross income (as defined in section 555(a)) for the taxable year is foreign personal holding company income as defined in section 553; but if the corporation is a foreign personal holding company with respect to any taxable year ending after August 26, 1937, then, for each subsequent taxable year, the minimum percentage shall be 50 percent in lieu of 60 percent, until a taxable year during the whole of which the stock ownership required by paragraph (2) does not exist, or until the expiration of three consecutive taxable years in each of which less than 50 percent of the gross income is foreign personal holding company income, For purposes of this paragraph, there shall be included in the gross income the amount includible therein as a dividend by reason of the application of section 555(c)(2); and

(2) STOCK OWNERSHIP REQUIREMENT.—At any time during the taxable year more than 50 percent in value of its outstanding stock is owned, directly or indirectly, by or for not more than five individuals who are citizens or residents of the United States, hereinafter called "United States group".

[4] SEC. 957. CONTROLLED FOREIGN CORPORATIONS: UNITED STATES PERSONS.

(a) GENERAL RULE.—For purposes of this subpart, the term "controlled foreign corporation" means any foreign corporation of which more than 50 percent of the total combined voting power of all classes of stock entitled to vote is owned (within the meaning of section 958(a)), or is considered as owned by applying the rules of ownership of section 958(b), by United States shareholders on any day during the taxable year of such foreign corporation.

[5] The definition of U.S. shareholder under the foreign personal holding company provisions differs from the definition of that term under subpart F. Compare sec. 551(a) with sec. 951(b). However, in the instant case, for the purposes of either the foreign personal holding company provisions or subpart F, both Leonard and Georgia were U.S. shareholders of Oil Services whenever they were shareholders of Oil Services.

[6] Oil Services' only income during the taxable years 1964, 1965, and 1967, was derived from interest except for $425 of "miscellaneous" income in 1964. The parties have not explained whether they treated this "miscellaneous" income as foreign personal holding company income, nor have they explained why they did not treat such income as undistributed foreign personal holding company income. Also, it should be noted that for 1967 the difference between Oil Services' interest income of $18,501.55 and its undistributed foreign personal holding company income of $14,633.07 is apparently due to the reduction of the interest income by certain deductions properly allocable to it under sec. 954(b)(5). While on their 1967 return petitioners had originally deducted $4,786.04, the inference from the stipulation is that the parties here agreed that only $3,868.48 representing "Federal income tax" is properly allocable to that interest income.

required to include in their gross income, as a dividend, the amount they would have received as a dividend if on the last day of each of the years 1964, 1965, and 1967, Oil Services had distributed, and petitioners had received, all of Oil Services' undistributed foreign personal holding company income. Both parties agree that for petitioners' taxable years 1964, 1965, and 1967, petitioners were thus subject to tax under section 551(b).

Turning to section 951(a) we find that as pertinent in the instant case, every U.S. shareholder of a controlled foreign corporation—

shall include in his gross income, for his taxable year in which or with which such taxable year of the corporation ends—

(A) the sum of—

(i) except as provided in section 963, his pro rata share (determined under paragraph (2)) of the corporation's subpart F income for such year, and

(ii) his pro rata share (determined under section 955(a)(3)) of the corporation's previously excluded subpart F income withdrawn from investment in less developed countries for such year; and

(B) his pro rata share (determined under section 956(a)(2)) of the corporation's increase in earnings invested in United States property for such year (but only to the extent not excluded from gross income under section 959(a)(2)).

Subpart F income is defined as the sum of income derived from the insurance of U.S. risks, and foreign base company income. Sec. 952(a). Foreign base company income is further defined as the sum of foreign personal holding company income, foreign base company sales income, and foreign base company services income. Sec. 954(a).

For 1964, 1965, and 1967, Oil Services had no previously excluded subpart F income withdrawn from investment in less developed countries, but it did have both subpart F income and an increase in earnings invested in U.S. property for each of such years. And almost all, if not all, of its subpart F income for 1964, 1965, and 1967, was foreign personal holding company income as defined in section 954.[7] This foreign personal holding company income as defined in section 954 consisted of the very same income which constituted foreign personal holding company income as defined under section 553 of the foreign personal holding company provisions and which would have been includable in petitioners' gross income under section 551(b).[8]

Applying simultaneously the dictates of sections 551(b) and 951(a), petitioners might have been obliged to include the very same interest income twice in their own gross income.

---

[7] The parties have not explained whether they have treated Oil Services' "miscellaneous" income of $425 for the taxable year as subpart F income. See fn. 6 *supra*.

[8] Note that under sec. 553 foreign personal holding company income has a definition different from the corresponding definition under sec. 954. Thus, sec. 954(c)(1) provides that for the purposes of subpart F foreign personal holding company income means foreign personal holding company income as defined in sec. 553 as further modified and adjusted by the provisions of sec. 954(c)(2), (3), and (4). However, in the present case it appears that whether determined under the foreign personal holding company provisions or under subpart F, foreign personal holding company income would come to the same amount.

Fortunately for U.S. shareholders of corporations simultaneously qualifying as foreign personal holding companies and controlled foreign corporations, subpart F contains a saving provision to protect against the possibility of such double taxation. That provision, section 951(d), provides as follows:

(d) COORDINATION WITH FOREIGN PERSONAL HOLDING COMPANY PROVISIONS.— A United States shareholder who, for his taxable year, is subject to tax under section 551(b) (relating to foreign personal holding company income included in gross income of United States shareholders) on income of a controlled foreign corporation shall not be required to include in gross income, for such taxable year, *any amount* under subsection (a) with respect to such company. [Emphasis supplied.]

Were it not for section 951(d), petitioners under section 951(a) would have had to include in their gross income for their taxable years 1964, 1965, and 1967, the sum of (1) Oil Services' foreign personal holding company income (as determined under section 954(c) via sections 951(a)(1)(A)(i), 951(a)(2), 952(a)(2), and 954(a)(1)) and (2) Oil Services' increase in earnings invested in U.S. property (as determined under section 956 via sections 951(a)(1)(B) and 951(a)(4)). The parties agree that because of section 951(d), petitioners need not include Oil Services foreign personal holding company income in their gross income under section 951(a). However, despite section 951(d), respondent argues that petitioners must include Oil Services' increase in earnings invested in U.S. property in their gross income under section 951(a)(1)(B).

If we were faced only with the provisions of the statute, we would have little trouble in rejecting respondent's argument and adopting the straightforward reading of section 951(d) urged upon us by petitioners. Since for Leonard's taxable years 1964 and 1965 and for Georgia's taxable years 1964, 1965, and 1967, each was a "United States shareholder who, for his taxable year, is subject to tax under section 551(b) * * * on income of a controlled foreign corporation," it would apparently immediately follow that they "shall not be required to include in gross income, for such taxable year, *any amount* under subsection (a) with respect to such company." (Emphasis supplied.)

Unfortunately our judicial task becomes complicated because respondent finds direct support for his position in section 1.951–3, Income Tax Regs., which provides in pertinent part as follows:

A United States shareholder (as defined in section 951(b)) who is required under section 551(b) to include in his gross income for his taxable year his share of the undistributed foreign personal holding company income *for the taxable year* of a foreign personal holding company (as defined in section 552) which for that taxable year is a controlled foreign corporation (as defined in section 957) shall not be required to include in his gross income for his taxable year under section 951(a)

and paragraph (a) of section 1.951–1 any amount attributable to the earnings and profits of such corporation *for that taxable year* of such corporation. * * * [Emphasis supplied.]

This regulation indirectly implies that a U.S. shareholder who, for his taxable year, is subject to tax under section 551(b) on income of a controlled foreign corporation might be required to include in his gross income for that year amounts attributable to the corporation's earnings and profits for one of the corporation's other taxable years. That implication is actually spelled out in example 5 of the regulation where it is held that if a corporation is both a foreign personal holding company and a controlled foreign corporation for its taxable year, its sole U.S. shareholder must include in his gross income for his corresponding taxable year not only the corporation's undistributed foreign personal holding company income as required under section 551(b), but also its increase in earnings invested in U.S. property for that year.[9]

Petitioners ask that we invalidate this regulation. We find their request compelling, and hold that insofar as section 1.951–3, Income Tax Regs., requires a U.S. shareholder, who for his taxable year is subject to tax under section 551(b) on income of a controlled foreign corporation, to include in gross income for such taxable year any amount under section 951(a)(1)(B) with respect to such controlled foreign corporation, it is invalid.

---

[9] Example (4). (a) A, a United States shareholder, owns 100 percent of the only class of stock of controlled foreign corporation P, organized on January 1, 1963. Both A and P Corporation use the calendar year as a taxable year. During 1963, 1964, and 1965, P Corporation is not a foreign personal holding company as defined in section 552(a); in each of such years, P Corporation derives dividend income of $10,000 which constitutes foreign personal holding company income (within the meaning of section 1.954–2) but under paragraph (b)(1) of section 1.954–1 excludes such amounts from foreign base company income as dividends received from, and reinvested in, qualified investments in less developed countries. Corporation P's earnings and profits accumulated for 1963, 1964, 1965 and determined under paragraph (b)(2) of section 1.955–1 are $40,000. For 1966, P Corporation is a foreign personal holding company, has predistribution earnings and profits of $10,000, derives $10,000 of income which is both foreign personal holding company income within the meaning of section 553 and subpart F income within the meaning of section 952, distributes $8,000 to A, and has undistributed foreign personal holding company income of $2,000 within the meaning of section 556. In addition, for 1966 P Corporation has a withdrawal (determined under section 955(a) but without regard to its earnings and profits for such year) of $25,000 of previously excluded subpart F income from investment in less developed countries. A is required under section 551(b) to include in his gross income for 1966 as a dividend the $2,000 undistributed foreign personal holding company income. The $8,000 distribution is includible in A's gross income for 1966 under sections 61(a)(7) and 301 as a distribution to which section 316(a)(2) applies. Corporation P's $25,000 withdrawal of previously excluded subpart F income from investment in less developed countries is includible in A's gross income for 1966 under section 951(a)(1)(A)(ii) and paragraph (a)(2) of section 1.951–1.

\* \* \* \* \* \* \*

Example (5). (a) The facts are the same as in paragraph (a) of example (4), except that, instead of having a $25,000 decrease in qualified investments in less developed countries for 1966, P Corporation invests $20,000 in tangible property (not described in section 956(b)(2)) located in the United States and such investment constitutes an increase (determined under section 956(a) but without regard to the earnings and profits of P Corporation for 1966) in earnings invested in United States property. Corporation P's earnings and profits accumulated for 1963, 1964, and 1965 and determined under paragraph (b)(1) of section 1.956–1 are $22,000. The result is the same as in paragraph (a) of example (4) except that instead of including the $25,000 withdrawal, A must include $20,000 in his gross income for 1966 under section 951(a)(1)(B) and paragraph (a)(3) of section 1.951–1 as an investment of earnings in United States property.

In invalidating this regulation we have borne in mind the general principles that regulations must be upheld unless they are unreasonable or plainly inconsistent with the statute and should not be overruled except for weighty reasons, *Commissioner* v. *South Texas Co.*, 333 U.S. 496, 501 (1948), that insofar as a regulation is not in conflict with express statutory provisions, it has the force and effect of law, *Maryland Casualty Co.* v. *United States*, 251 U.S. 342, 349 (1920), and that where a statute uses "ambiguous terms, or is of doubtful construction, a clarifying regulation or one indicating the method of its application to specific cases not only is permissible but is to be given great weight by the courts." *Koshland* v. *Helvering*, 298 U.S. 441, 446 (1936). But we are also well aware of the propositions that the statute is the primary authority, and the regulations to the extent they are in conflict with the statute are void, *Boykin* v. *Commissioner*, 260 F. 2d 249, 254 (C.A. 8, 1958), modifying 29 T.C. 813 (1958), that a regulation which conflicts with statutory provisions is a mere nullity, *Fabian Tebon, Jr.*, 55 T.C. 410, 413 (1970), and that where the provisions of a statute "are unambiguous, and its directions specific, there is no power to amend it by regulation." *Koshland* v. *Helvering, supra* at 447.

We believe that application of these principles leads to the inevitable conclusion that the regulation in question here is not only inconsistent with the clear and unambiguous language of the statute but would have the effect of departing from and putting aside the statutory mandate. See *Lynch* v. *Tilden Co.*, 265 U.S. 315, 321 (1924).

Respondent has presented numerous arguments to uphold the validity of his regulation. We are persuaded by none of those arguments for we fail to see how section 1.951–3, Income Tax Regs., can reasonably transform the term "any amount under subsection (a)" into the term "any amount under subsection (a) except amounts under subparagraph (a)(1)(B)."

Respondent's principal contention is that petitioners' reading of section 951(d) runs counter not only to the regulations but to the "statutory scheme" itself. Subpart F was first enacted as part of the Revenue Act of 1962, 76 Stat. 960. By reference to certain general language in the Senate Finance Committee report accompanying the bill which eventually became the Revenue Act of 1962, respondent claims that petitioners' construction—

would thwart the purpose of section 951(a)(1)(B) which was enacted, in general, "* * * to end tax deferral on 'tax haven' operations by U.S. controlled corporations," and, more specifically to insure that foreign corporations' "* * * earnings are not indirectly brought back to the United States in a manner which avoids the U.S. tax * * *" S. Rept. 1881, 87th Cong. (1962), C.B. 1962–3, 785–86.

Even assuming that the existence of a clear "statutory scheme" would be sufficient to allow this Court to rewrite the language of the statute, we are unable to agree with respondent's premise that such a consistent "statutory scheme" exists. While we do not doubt that Congress sought to achieve the general purposes quoted above in the Senate committee report, it appears that subpart F, as finally enacted, embodies numerous exceptions to those general purposes. A review of the events leading to the enactment of subpart F is sufficient to show that respondent's ideal of a "statutory scheme" is elusive indeed.

In 1961, President Kennedy sent a tax revision proposal to Congress. In that proposal the President recognized that, "Profits earned abroad by American firms operating through foreign subsidiaries are, under present tax laws, subject to U.S. tax only when they are returned to the parent company in the form of dividends." Hearings on the President's 1961 Tax Recommendations before the House Committee on Ways and Means, 87th Cong., 1st Sess., vol. 1, p. 8 (1961). In order to prevent such tax deferral the President proposed legislation which would have taxed "each year American corporations on their current share of the undistributed profits realized in that year by subsidiary corporations organized in economically advanced countries. This current taxation would also apply to individual shareholders of closely held corporations in those countries." *Id.* at p. 9.

After lengthy hearings the House decided that the President's recommendations went too far and might have had the effect of placing American-owned business operating abroad at a disadvantage with respect to firms operating in the same areas but not subject to U.S. tax. H. Rept. No. 1447, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 405, 461–462. Thus, when the House passed H.R. 10650, which eventually became the Revenue Act of 1962, it concentrated primarily on curbing "tax haven" devices and did "not eliminate tax deferral in the case of operating businesses owned by Americans which are located in the economically developed countries of the world." H. Rept. No. 1447, *supra*, 1962–3 C.B. 461–462; S. Rept. No. 1881, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 707, 785. The Senate made further changes which included at least two major "escape valves" and numerous other minor relief provisions. S. Rept. No. 1881, *supra*, 1962–3 C.B. 785–786. Consequently, as eventually enacted subpart F and various related provisions contained many major and minor exceptions to both the President's original proposals and the congressional "general purposes" upon which respondent places such heavy reliance. See, e.g., secs. 954(b)(3), 954(b)(4), 954(c)(3), 956(b)(2), 962, 963, 970–972. While the President's recommendations may have been founded upon broad theories of tax revision, a quick glance at subpart F will show that Congress legislated

in very detailed, tightly organized, and multidefinitional terms in creating these numerous exceptions. No doubt Congress had important and weighty reasons to carve out these exceptions, and many of these reasons are set forth in the committee reports accompanying H.R. 10650.[10]

But the point to be observed is that the existence of these many exceptions makes it hard to glean from subpart F the precise "statutory scheme" to which respondent alludes. In summary, we are not prepared to say that the purposes and goals of subpart F have been so obviously revealed as to preclude the possibility that Congress intended in certain cases that section 951(d) would provide favorable treatment for the taxpayer.

In any event, if we narrow the scope of our inquiry to an examination of the legislative history leading to the provisions for the coordination of the foreign personal holding company provisions with subpart F, we would find not only that such history fails to reveal any strongly pronounced policy with respect to the rule which is set forth in section 1.951–3, Income Tax Regs., but that there is good evidence that in using the language of section 951(d), Congress fully intended the result required by a straightforward reading of that language.

To prevent the possibility of taxation of the same foreign personal holding company income under both sections 551(b) and 951(a), Congress could have adopted any one of at least three approaches in those situations where a foreign corporation happened to be both a controlled foreign corporation and a foreign personal holding company.[11] It could have taxed such a corporation's U.S. shareholders as if the corporation were solely a foreign personal holding company. Thus, for example, the corporation's U.S. shareholders would not have been required to include in their gross income the corporation's increase in earnings invested in U.S. property since such increase is not taxed under the foreign personal holding company provisions. As an alternative, Congress could have taxed such shareholders as if the corporation were solely a controlled foreign corporation. Thus,

---

[10] In view of the many exceptions engrafted onto H.R. 10650 it is not surprising that certain Senators used rather strong language in describing the gradual erosion of the President's original aims. Thus, Senator Douglas stated that, "under heavy battering from American corporations doing business abroad, the proposed levies based on the earnings of their foreign subsidiaries were progressively softened, although there were some not satisfied even with that, who proposed to eliminate even the emasculated version still remaining." 108 Cong. Rec. 17766 (1962). And Senator Gore remarked that, "It really is a heartbreaking experience to see amendments such as the Committee on Finance has approved, offered at the last minute, to take care of special interests, which create and perpetuate such a loophole for tax dodgers." 108 Cong. Rec. 18189 (1962). See also Supplemental and Minority Views of Senators Paul Douglas and Albert Gore, S. Rept. No. 1881, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 1092, 1120–1128.

[11] Congress could also have avoided the problem of double taxation entirely by following suggestions that the foreign personal holding company provisions be eliminated. See Hearings on H.R. 10650 before the Senate Committee on Finance, 87th Cong., 2d Sess., Part 6, p. 2350, and Part 7, p. 3174 (1962).

for example, the corporation's U.S. shareholders in general would not have been required to include in their gross income the corporation's "rents and royalties which are derived in the active conduct of a trade or business and which are received from a person other than a related person" since such amounts are generally excluded from subpart F income under section 954(c)(3)(A).[12] Finally, Congress could have taxed such shareholders as if the corporation were both a foreign personal holding company *and* a controlled foreign corporation. Under this third approach, it could have been provided that amounts included in a U.S. shareholder's gross income under both sections 551(b) and 951(a) would be included only once for the purpose of computing the U.S. shareholder's gross income.

While respondent and his regulations take the third approach, our examination of section 951(d) convinces us that the first approach was the one Congress intended.

In support of our conclusion we first note that as originally reported by the House Committee on Ways and Means, H.R. 10650 had substantially adopted the third approach. Thus, section 13(b)(1) of H.R. 10650 as originally passed by the House sought to modify section 551(b) so that the amount of undistributed foreign personal holding company income otherwise required under section 551(b) to be included in a U.S. shareholder's gross income would be reduced by his proportionate share of undistributed foreign personal holding company income which under section 951(a) would have been included in his gross income as his pro rata share of subpart F income. See also H. Rept. No. 1447, *supra*, 1962–3 C.B. 604. But this provision, which was intended to coordinate the foreign personal holding company provisions with subpart F by modifying section 551(b), was later eliminated and its role was assumed by the addition of section 951(d), which has the effect of modifying section 951(a). S. Rept. No. 1881, *supra*, 1962–3 C.B. 944.

When Congress shifted the focus of coordination from modification of section 551(b) to modification of section 951(a), did it intend, as the words of section 951(d) require, that neither a controlled foreign corporation's subpart F income *nor* its increase in earnings invested in U.S. property would be included in the gross income of its U.S. shareholders who were already subject to tax under section 551(b) with respect to such corporation? We believe that an analysis of certain

---

[12] Note, however, that if a controlled foreign corporation's foreign base company income exceeds 70 percent of gross income, the controlled foreign corporation's entire gross income for the taxable year shall, subject to the provisions of sec. 954(b)(1), (2), (4), and (5), be treated as foreign base company income and hence will presumably be included in the gross income of the controlled foreign corporation's U.S. shareholders. Sec. 954(b)(3)(B).

related legislative changes in the language that eventually became section 951(c) indicates that Congress did have such an intention.[13]

Section 951(c) coordinates subpart F with the election of a foreign investment company to distribute income. As originally passed in the House version of H.R. 10650, section 951(c) provided that a U.S. person who, for his taxable year, is a qualified shareholder of a foreign investment company with respect to which an election under section 1247 is in effect "shall not be required to include in gross income, for such taxable year, *subpart F income* of such company." (Emphasis supplied.) See also H. Rept. No. 1447, *supra*, 1962–3 C.B. 589. As changed by the Senate and as eventually enacted, section 951(c) provided that a U.S. shareholder who, for his taxable year, is a qualified shareholder of such company "shall not be required to include in gross income, for such taxable year, *any amount under subsection (a)* with respect to such company." (Emphasis supplied.) The Senate Finance Committee report explaining this change specifically noted that the "corresponding provision of the bill as passed by the House applied only to subpart F income." S. Rept. No. 1881, *supra*, 1962–3 C.B. 944. That the Senate intended, by this change, to broaden the exclusion under section 951(c) strongly implies that when it added section 951(d) with its identical words of exclusion, it intended the same result.

Respondent next argues that section 951(d) "does not, even on its face, require the construction which petitioners urge."

In support of this proposition he first brings our attention to the fact that section 951(d) is entitled "Coordination with Foreign Personal Holding Company Provisions." He argues that the word "coordination" has been defined to mean "combination in suitable relation or so as to give harmonious results," that the word has been used sparingly in the Internal Revenue Code of 1954, that his research has disclosed no instance where it has been used to describe an "invariably and mutually exclusive relationship between two Code sections," and that under the above definition such use would probably be improper.

Respondent is grasping at straws.

---

[13] It is significant that Congress knew that the operation of subpart F alone might have the effect of taxing greater amounts than would the operation of the foreign personal holding company provisions alone. Thus, the House had recognized that its version of subpart F might establish "stricter income tests" than the foreign personal holding company provisions. H. Rept. No. 1447, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 405, 435. As a consequence it concluded that the foreign personal holding company provisions should have been modified to conform to subpart F and wrote into H.R. 10650 at least two basic modifications of those provisions. H. Rept. No. 1447, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 405, 435–436. However, for reasons suggested at the Senate hearings on H.R. 10650, the Senate eliminated these modifications and the House eventually accepted the Senate's action. Conf. Rept. No. 2508, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 1129, 1147; see Hearings on H.R. 10650 before the Senate Committee on Finance, 87th Cong., 2d Sess., part 2, pp. 561–562; part 7, pp. 3174–3176, 3282–3283; part 11, pp. 4893–4894 (1962).

In the first place while the heading of a section or subsection may have some bearing on the meaning of the statutory language if such language is ambiguous, e.g., *Renstrom* v. *United States*, 220 F. Supp. 688, 692 (D. Neb. 1963), we could not read the title of section 951(d) in a manner which would destroy the clear and unambiguous text of that section. Cf. sec. 7806(b). Furthermore, use of the word "coordination" in each of such sections as sections 951(c), 992(e), 3402(n), and 7447(g) appears to describe no less "an invariably and mutually exclusive relationship between two Code sections" than does the relationship we have set forth with respect to sections 551(b) and 951(a).[14] Finally, respondent's definition (which is only one of several definitions available in the dictionaries) does not appear inappropriate to describe the manner in which we read section 951(d) as linking subpart F to the foreign personal holding company provisions.

Respondent's final attempt to convince us of his position relates to what he perceives as an ambiguity in the words "any amount." Referring to a U.S. shareholder, respondent rhetorically asks, "He need not include 'any amount' of what?" and answers his own question by saying "he need not include any amount of the corporation's current income." If respondent had continued reading section 951(d), he would have realized that the proper answer to his question would have been that such a shareholder need not include "any amount under subsection (a) with respect to such company."

Respondent fears that our construction of section 951(d) would convert section 551 into a "relief provision." [15]

However, there is no more persuasive evidence of the statute's purpose than the words by which Congress undertook to give expres-

---

[14] In fact it may be open to question whether sec. 951(d) describes "an invariably and mutually exclusive relationship." Because the operation of sec. 951(d) is triggered by the phrase "subject to tax" sec. 951(d) could be read so that in a particular case a U.S. shareholder required to include amounts in his gross income under sec. 551(b) might also still be required to include in his gross income under sec. 951(a) amounts with respect to the same company. But see Tillinghast, "Problems of the Small or Closely Held Corporation Under the Revenue Act of 1962," 22d Ann. N.Y.U. Tax Inst. 697, 717, fn. 57 (1964) (in determining if amounts should be included in a U.S. shareholder's gross income under sec. 951(a), it should be irrelevant whether or not the U.S. shareholder would actually have borne tax on the amount included under the foreign personal holding company provisions) and compare *Burke Concrete Accessories, Inc.*, 56 T.C. 588 (1971) (corporation not "entitled to benefits" of Code provision unless it could actually obtain such benefits).

[15] Respondent suggests that if petitioner's contention is upheld, "any controlled foreign corporation could repatriate its previously retained earnings with impunity by becoming a foreign personal holding company with $1 of undistributed foreign personal holding company income in the year of repatriation." Respondent's hypothetical may not be as alarming as he would make it out to be.

While in a particular case, a U.S. shareholder may actively and purposefully seek to qualify his controlled foreign corporation as a foreign personal holding company in order to derive some tax advantage, in other instances unavoidable classification as a foreign personal holding company may lead to the loss of some of the benefits of subpart F. For a detailed analysis of the relative advantages and disadvantages of falling under the foreign personal holding company "regime" as opposed to the "regime" of subpart F see Tillinghast, "Problems of the Small or Closely Held Corporation Under the Revenue Act of 1962," 22d Ann. N.Y.U. Tax Inst. 697 (1964); and Tillinghast, "United States Income Taxation of Foreign Source Income: A Survey of the Provisions and Problems," 29th Ann. N.Y.U. Tax Inst. 33–35 (1971).

A further premise of respondent's hypothetical is that becoming a foreign personal holding company is an easy matter. While in some cases, a controlled foreign corporation might easily also become a foreign personal holding company, there would be numerous instances where such conversion would be very difficult if not impossible. For instance, the stock ownership requirement under the foreign personal holding company provisions is keyed to the *value* of the foreign corporation's outstanding stock, sec. 552(a)(2), while under

sion to its wishes, and here examination of the legislative history does not require a different interpretation of those words. See *United States* v. *Amer. Trucking Ass'ns.*, 310 U.S. 534, 543 (1940). If for any reason the language of the statute should be changed, it is the responsibility of Congress, and not the prerogative of this Court, to effect such change.

Because of our resolution of this issue we need not reach petitioners' alternative argument that if Oil Services' increase in earnings invested in U.S. property is includable in petitioners' gross income under section 951(a)(1)(B), then Oil Services' earnings and profits accumulated before 1963 should not be taken into account in calculating such increase.

## 2. *Taxable Year 1963*

As Oil Services was not a foreign personal holding company in 1963, petitioners for 1963 were not subject to tax under section 551(b) with respect to Oil Services. Thus, since Oil Services was a controlled foreign corporation and since it had an increase in earnings invested in U.S. property for 1963, petitioners were required under section 951(a)(1)(B) to include such increase in their gross income for 1963.

Petitioners contend that the tax imposed upon them by the operation of section 951(a)(1)(B) is unconstitutional. They have summarized their grounds for this view as follows: [16]

---

subpart F the stock ownership requirement looks to the *voting power* owned by U.S. shareholders. Sec. 957(a). Thus, U.S. shareholders owning all of a controlled foreign corporation's voting stock might have a problem in transforming their controlled foreign corporation into a foreign personal holding company if foreign interests owned all of the other, more valuable, nonvoting stock. As another example, a foreign corporation cannot be a foreign personal holding company unless the requisite amount of stock "is owned, directly or indirectly, by or for not more than five individuals who are citizens or residents of the United States." Sec. 552(a)(2). Where, for instance, a controlled foreign corporation is the foreign subsidiary of a large, public American corporation the concentrated ownership necessary to qualify as a foreign personal holding company would be inconceivable.

Finally, it is in the nature of hypotheticals that for each imaginary situation in which the Treasury is seemingly deprived of revenue there generally exists an equally shocking imaginary situation in which the taxpayer has seemingly paid more than his share. In fact, taxpayer-oriented hypotheticals bearing upon the interrelation of the foreign personal holding company provisions and subpart F and the "anomalous results" of such hypotheticals were presented at the Senate hearings on H.R. 10650. Hearings on H.R. 10650 before the Senate Committee on Finance, 87th Cong., 2d sess., part 7, pp. 3191–3194 (1962). For all we know it was these "anomalous results" which provided the Senate with the impetus to adopt sec. 951(d) and, hence, to change the House's solution to the problem of coordinating the foreign personal holding company provisions with subpart F.

[16] Those parts of the Constitution which are relevant to petitioners' attack provide as follows:

Art. I, sec. 2, cl. 3:

direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers, * * *

Art. I, sec. 8, cl. 1:

The Congress shall have Power To lay and collect Taxes, * * *

Art. I, sec. 9, cl. 4:

No Capitation, or other direct, Tax shall be laid, unless in Proportion to the Census or Enumeration herein before directed to be taken.

Amend. V:

nor shall any person * * * be deprived of life, liberty, or property, without due process of law; * * *

Amend. XVI:

The Congress shall have power to lay and collect taxes on incomes, from whatever source derived, without apportionment among the several States, and without regard to any census or enumeration.

Stated directly, the issue here is whether Subpart F—Controlled Foreign corporations, being Sections 951–964, at least to the extent that it attempts to impose a tax on shareholders of a controlled foreign corporation on an amount equal to the shareholder's pro-rata share of increase in earnings invested in U.S. property for a particular year involved, as outlined in Section 951(a)(1)(B) and 956(a)(1) and (2) IRC 1954, [is] invalid under the provisions of Article I, Sections 2, Clause 3 and 9, Clause 4, not apportioned among the states according to census and enumeration, and not within the meaning of income as referred to in the 16th Amendment to the U.S. Constitution.

Under this argument petitioners must show that the tax to which they object is both a direct tax unapportioned among the States *and* a tax on something which does not constitute income within the meaning of the 16th amendment; if they fail to show either, they must fail altogether. *Penn Mutual Indemnity Co.*, 32 T.C. 653 (1959), affd. 277 F.2d 16 (C.A. 3, 1960). Bearing in mind that every act of Congress is presumed valid and constitutional unless otherwise shown, e.g., *United States* v. *Gambling Devices*, 346 U.S. 441, 449 (1953); *Buttfield* v. *Stranahan*, 192 U.S. 470, 492 (1904), we conclude that the tax payable by petitioners on Oil Services' increase in earnings invested in U.S. property for 1963 is a tax on income and hence within the power given to Congress under the 16th amendment.[17]

Petitioners have based their constitutional arguments on the general operation of the statute and have posed hypothetical situations based on that operation.

Looking to the precise facts here we find that for 1963 petitioners Leonard and Georgia were husband and wife and owned all of Oil Services' stock as joint tenants with right of survivorship. In 1963 Oil Services had an increase in earnings invested in U.S. property. Under the statute this increase triggered inclusion in petitioners' 1963 gross income of an amount equal to the increase. At the same time Oil Services' 1963 earnings and profits were appreciably larger than this increase.[18] If the amount included in petitioners' 1963 gross income under section 951(a)(1)(B) is deemed as deriving from Oil Services' 1963 earnings and profits,[19] the question we must answer boils down to whether Congress may constitutionally tax the current

---

[17] Our conclusion should not be taken as implying that the constitutionality of the statutory provisions in question here might not also be upheld on some other ground. Cf., e.g., Treasury Memorandum from Robert H. Knight to Secretary Dillon, Hearings on the President's 1961 Tax Recommendations before the House Committee on Ways and Means, 87th Cong., 1st Sess., vol. 1, p. 313 (1961).

[18] Oil Services' earnings and profits accumulated during 1963 were $26,459.99 while its increase in earnings invested in U.S. property for 1963 was $13,653.

[19] This assumption is valid since we may view sec. 951(a)(1)(B) as taxing Oil Services' increase in earnings invested in U.S. property as a constructive dividend to petitioners. See Jenks, "Controlled Foreign Corporations' Investment in United States Property: A New Dividend Concept," 21 Tax L. Rev. 323, 324 (1966). Since a normal dividend would be treated as made out of a corporation's most recently accumulated earnings and profits, sec. 316(a), analogous treatment would apply to a constructive dividend. This constructive dividend theory finds support in the language of sec. 956(a)(1) which defines a controlled foreign corporation's earnings invested in U.S. property at the close of any taxable year as the aggregate amount of such property held to the extent such amount would have constituted a dividend if it had been distributed.

undistributed income of a corporation to the corporation's only two joint stockholders.

We should first point out that Oil Services' undistributed 1963 earnings and profits were as much petitioners' income as if petitioners had received such earnings and profits themselves. We emphasize this reality because petitioners' arguments imply that in certain cases the taxation of a controlled foreign corporation's minority U.S. stockholder on that corporation's income would be unfair or inequitable. We perceive in these arguments an attack on the statute on due process grounds. See, e.g., *Heiner* v. *Donnan*, 285 U.S. 312, 326–327 (1932), and *Hoeper* v. *Tax Commission*, 284 U.S. 206, 215 (1931). But such an attack would fail. Whether we employ a theory based on constructive receipt, e.g., *Ross* v. *Commissioner*, 169 F. 2d 483, 490–491 (C.A. 1, 1948), alter ego, compare *National Carbide Corp.* v. *Commissioner*, 336 U.S. 422, 427–428, fn. 6 (1949), with *Moline Properties* v. *Commissioner*, 319 U.S. 436, 440 (1943), or actual command, e.g., *Higgins* v. *Smith*, 308 U.S. 473, 478 (1940), it is clear that petitioners' joint control of Oil Services' income was absolute and complete. If Congress has legislatively declared that it will bypass the corporate entity in taxing certain foreign-source income, the mere circumstance of petitioners' interposition of a foreign corporate framework between themselves and income over which they had complete control would certainly be no constitutional barrier to the taxation of that income to petitioners. See *Helvering* v. *City Bank Co.*, 296 U.S. 85, 90 (1935).

Petitioners also argue that attribution of a corporation's income to its stockholders violates the basic concept that a corporation is an entity separate and distinct from its stockholders. Whatever may be the validity of that concept, the history of U.S. income taxation shows that Congress has for decades been drafting income tax statutes which have bypassed the corporate entity. Furthermore, the Supreme Court's pronouncements have been to the effect that taxation of undistributed current corporate income at the stockholder level rather than at the corporate level is within the congressional power.

In *Collector* v. *Hubbard*, 12 Wall. 1 (1870), the Supreme Court held not only that Congress could tax income but also that it could tax a corporation's annual undistributed income to the corporation's shareholders. However, in *Pollock* v. *Farmers' Loan & Trust Co.*, 158 U.S. 601 (1895), supplementing 157 U.S. 429 (1895), a closely divided Supreme Court held that under an 1894 Act taxes imposed on income from real or personal property were equivalent to direct taxes and were therefore unconstitutional since they had not been apportioned among the States. In 1913, as an answer to *Pollock*, the 16th amendment was enacted to give Congress the "power to lay and collect taxes on in-

comes, from whatever source derived, without apportionment among the several States, and without regard to any census or enumeration."

Shortly after the enactment of the 16th amendment, Congress enacted the first modern income tax measure, the Tariff Act of 1913, 38 Stat. 114. In that Act as well as in the Revenue Acts of 1916 and 1918 Congress included in stockholders' income undistributed profits accumulated by corporations availed of for the purpose of preventing imposition of surtaxes on the stockholders.[20] Sec. 220, Revenue Act of 1918, 40 Stat. 1072; sec. 3, Revenue Act of 1916, 39 Stat. 758; sec. IIA, subdiv. 2, Tariff Act of 1913, 38 Stat. 166. Furthermore, under the Revenue Acts of 1918 and 1921 and until 1922, "personal service corporations" were not taxed, but their individual stockholders were taxed in the same manner as members of partnerships. Sec. 218(d), Revenue Act of 1921, 42 Stat. 245; sec. 218(e), Revenue Act of 1918, 40 Stat. 1070.

In 1920 the Supreme Court handed down the landmark case of *Eisner* v. *Macomber*, 252 U.S. 189 (1920), upon which petitioners place heavy reliance. The issue in *Macomber* was whether, by virtue of the 16th amendment, Congress had the power to tax, as income of the stockholder and without apportionment, a stock dividend made against a corporation's profits accumulated after February 28, 1913. In a 5–4 decision the Supreme Court decided that Congress had no such power. The reasoning was that such *accumulated* earnings constituted the stockholder's share in capital, and not income. 252 U.S. at 219. But we cannot read *Macomber* as denying to Congress the power to attribute a corporation's undistributed *current* income to the corporation's *controlling* stockholders.

In the first place the majority in *Macomber* was primarily addressing itself to situations involving corporations in which stockholders had none of the control contemplated by subpart F. Thus, the majority speaks at length of the existence and nonexistence of stockholder rights in a corporation's profits and capital. 252 U.S. at 208–209. In view of the thrust of the Court's logic it is safe to say that the Court simply did not direct itself to the situation of the tightly controlled corporation where controlling stockholders are able to manipulate the corporation's profits and capital almost at will.

But, in passing, the majority did remark that a court has the power and duty to look through the form of the corporation to determine the question of stockholder rights in order to ascertain whether a stockholder had received income taxable by Congress without apportionment. 252 U.S. at 213. Thus, in matters of income taxation the

---

[20] In 1921 Congress amended this provision so that the surtax on accumulations to evade tax was shifted from the stockholders to the corporation itself. Sec. 220, Revenue Act of 1921, 42 Stat. 247.

*Macomber* decision would not prohibit disregard of the corporate entity if a stockholder's actual rights and powers over the corporation's income were sufficiently great. In subpart F Congress has singled out a particular class of what it considered appropriate cases for bypassing the corporate entity in determining the incidents of income taxation. By enacting this statute Congress legislatively determined that possession of a certain degree of control over the corporation gives to a stockholder certain rights and powers which, in effect, permit command over the corporation's undistributed income. Since it is clear in the instant case that petitioners had the actual right and power to manipulate their corporation as if it were the family pocketbook, *Macomber* would be no bar to the application of that legislative determination. Cf. *Asiatic Petroleum Co.* v. *Commissioner*, 79 F.2d 234, 238 (C.A. 2, 1935), affirming 31 B.T.A. 1152 (1935), certiorari denied 296 U.S. 645 (1935) ("If anticipatory arrangements intended to circumvent taxes may be disregarded by courts without the aid of statutory authority, a statute authorizing the Commissioner to disregard them under similar circumstances cannot be unconstitutional.")

It is also important to note that the *Macomber* majority was primarily concerned with Congress' power to tax a corporation's undistributed *accumulated* earnings to the corporation's stockholders, and did not linger upon the question of congressional power to tax a corporation's *current* undistributed income to the corporation's stockholders.[21]

We conclude that, on the facts of the instant case, there is no constitutional bar to taxation of the corporation's undistributed current income to the corporation's controlling stockholders. At least two lower courts have reached constitutional issues involving the foreign personal holding company provisions and in both instances have found the provisions to be constitutionally sound. See *Eder* v. *Commissioner*, 138 F. 2d 27 (C.A. 2, 1943), remanding on other grounds 47 B.T.A. 235 (1942); *Rodney* v. *Hoey*, 53 F. Supp. 604 (S.D.N.Y. 1944), and cases there cited. Originally enacted in 1937, those provisions are analogous to subpart F in that, in general, they tax U.S. shareholders of foreign personal holding companies on such companies' undistributed income. Most recently in *Garlock Inc.*, 58 T.C. 423 (1972), we held that the taxation to a controlled foreign corporation's U.S. shareholders of the corporation's subpart F income was not unconstitutional.

In light of the case law and our observations today, we go one step further and hold that as applied to the instant case the taxation to a

---

[21] Even though we believe the operation of subpart F in the instant case is within the bounds of *Macomber*, it is significant to observe that the continuing vitality of the *Macomber* doctrine is in considerable question. See, e.g., *Commissioner* v. *Glenshaw Glass Co.*, 348 U.S. 426 (1955); *Helvering* v. *Griffiths*, 318 U.S. 371 (1943) *Helvering* v. *Bruun*, 309 U.S. 461 (1940).

controlled foreign corporation's U.S. shareholders of the corporation's increase in earnings invested in U.S. property is not unconstitutional.

Petitioners' final argument pertains to the availability to respondent of the 6-year statute of limitations of section 6501(e)(1)(A)(ii).[22] The parties agree that petitioners omitted from their gross income $13,653 which on the face of section 951(a)(1)(B) was properly includable on their return for 1963 as under Oil Services' increase in earnings invested in U.S. property. This amount was in excess of 25 percent of the amount of gross income stated in their return. It is also clear that respondent notified petitioners of this deficiency more than 3 years but not more than 6 years after they had filed such return. The question presented is whether petitioners' return provided adequate disclosure of the omitted gross income.

In order for petitioners to come within the protection of section 6501(e)(1)(A)(ii), amounts omitted from gross income stated in the return should have been disclosed therein, or in a statement attached thereto, in a manner adequate to apprise the Commissioner "of the *nature and amount* of such item." (Emphasis supplied.) While disclosure of the type anticipated in section 6501(e)(1)(A)(ii) does not mean "a detailed revelation of each and every underlying fact," neither does it mean existence of "a 'clue' which would be sufficient to intrigue a Sherlock Holmes." *George Edward Quick Trust*, 54 T.C. 1336, 1347 (1970), affd. 444 F. 2d 90 (C.A. 8, 1971). In the present case we find that the few bits of disclosed information fail to give even the vaguest clue of the nature or amount of petitioners' omission.

The only facts tending to show disclosure are three items listed on the asset side of Oil Services' balance sheet for December 31, 1963. These items were notes receivable of $47,077.49, accounts receivable of $181,924.88, and investment in common stocks of $257,500. There was no listing of Oil Services' assets as of the beginning of 1963, nor was there any indication that any part of these items constituted U.S. property within the meaning of section 956(b). These meager balance sheet entries were insufficient to enable respondent to determine whether Oil Services had *any* earnings invested in U.S. property in 1963, much less whether it had an increase in such earnings for that

---

[2] SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION.

(e) SUBSTANTIAL OMISSION OF ITEMS.—Except as otherwise provided in subsection (c)—

(1) INCOME TAXES.—In the case of any tax imposed by subtitle A—

(A) GENERAL RULE.—If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. For purposes of this subparagraph—

\*        \*        \*        \*        \*        \*        \*

(ii) In determining the amount omitted from gross income, there shall not be taken into account any amount which is omitted from gross income stated in the return if such amount is disclosed in the return, or in a statement attached to the return, in a manner adequate to apprise the Secretary or his delegate of the nature and amount of such item.

year. The existence of such an increase was of course necessary for the ultimate finding that petitioners' gross income should have been augmented by the operation of section 951(a)(1)(B).

Petitioners cite such cases as *Colony, Inc.* v. *Commissioner*, 357 U.S. 28 (1958), *Benderoff* v. *United States*, 398 F. 2d 132 (C.A. 8, 1968), *Lazarus* v. *United States*, 142 F. Supp. 897 (Ct. Cl. 1956), and *Genevieve B. Walker*, 46 T.C. 630 (1966), and rely heavily on *Lyta J. Morris*, T.C. Memo. 1966–245. Nothing in those cases, or in any other of the cited cases, supports petitioners' view that they had provided respondent with a clue which constituted adequate disclosure for the purposes of section 6501(e)(1)(A)(ii). In the instant case there are just too many missing fact links in the logical chain connecting the items actually disclosed to the ultimate disclosure that petitioners had omitted amounts from the gross income stated on their return.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

SIMPSON, *J.*, dissenting: In invalidating section 1.951–3 of the Income Tax Regulations, this Court has again declined to exercise judicial restraint in the review of regulations and has chosen to assert the supremacy of its view as to the purpose of the legislation, and that view, which rests on a narrow reading of the statute, disregards the purposes of Congress in enacting the provisions for the taxation of controlled foreign corporations and will in fact frustrate such objectives. What our role should be in reviewing regulations was described by the Supreme Court in *United States* v. *Correll*, 389 U.S. 299, 306–307 (1967), when it said:

we do not sit as a committee of revision to perfect the administration of the tax laws. Congress has delegated to the Commissioner, not to the courts, the task of prescribing "all needful rules and regulations for the enforcement" of the Internal Revenue Code. 26 U.S.C. § 7805(a). In this area of limitless factual variations, "it is the province of Congress and the Commissioner, not the courts, to make the appropriate adjustments." *Commissioner* v. *Stidger*, 386 U.S. 287, 296. The role of the judiciary in cases of this sort begins and ends with assuring that the Commissioner's regulations fall within his authority to implement the congressional mandate in some reasonable manner. * * *

See *Bingler* v. *Johnson*, 394 U.S. 741, 749–751 (1969).

The Supreme Court, in strong and unequivocal terms, has repeatedly declared that the Treasury regulations should not be struck down lightly (see, e.g., *Bingler* v. *Johnson, supra* at 749–750; *Commissioner* v. *South Texas Co.*, 333 U.S. 496, 501 (1948); *Colgate Co.* v. *United States*, 320 U.S. 422, 426 (1943); *Fawcus Machine Co.* v. *United*

*States*, 282 U.S. 375, 378 (1931); *Brewster* v. *Gage*, 280 U.S. 327, 336 (1930)), and—

it is fundamental, of course, that as "contemporaneous constructions by those charged with administration of" the Code, the Regulations "must be sustained unless unreasonable and plainly inconsistent with the revenue statutes," and "should not be overruled except for weighty reasons." *Commissioner* v. *South Texas Lumber Co.*, 333 U.S. 496, 501. * * * [*Bingler* v. *Johnson*, 394 U.S. at 749-750.]

See Griswold, "A Summary of the Regulations Problem," 54 Harv. L. Rev. 404 (1941).

In this case, our task is to interpret section 951 and the other provisions of subpart F which result from a legislative proposal made by President Kennedy in April of 1961. The President was concerned that a number of businesses were moving abroad for tax reasons, and he wished to remove the tax advantages of doing business abroad. Hearings on the President's 1961 Tax Recommendations before the House Committee on Ways and Means, 87th Cong., 1st Sess., vol. 1, p. 8 (1961). He proposed to accomplish that objective by taxing, as earned, the income of foreign corporations controlled by U.S. citizens. *Id.* at p. 9. Congress was convinced of the need to act and adopted the President's ultimate objective, although it decided that such objective could be accomplished by less sweeping provisions. H. Rept. No. 1447, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 405, 461-462; S. Rept. No. 1881, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 707, 784-785. It believed that by taxing only certain types of income earned by controlled foreign corporations, the "tax haven" advantages of doing business abroad could be eliminated. H. Rept. No. 1447, *supra*, 1962-3 C.B. 461-462; S. Rept. No. 1881, *supra*, 1962-3 C.B. 784-785.

While Congress was considering the President's proposals, the Secretary of the Treasury and members of his staff met and conferred repeatedly with Congress concerning the taxation of controlled foreign corporations (see, e.g., Hearings, *supra*, vol. 1, pp. 28-34, 313-322; vol. 4, pp. 3535-3544; Hearings on H.R. 10650 before the Senate Committee on Finance, 87th Cong., 2d Sess., Part 1, pp. 98-99; Part 10, pp. 4288-4289 (1962)), and after the enactment of the controlled foreign corporations provisions on October 16, 1962, the Treasury commenced the task of preparing its implementing regulations. Those regulations were published in proposed form on July 10, 1964, and the public was given an opportunity to comment in writing and to present oral comments at a hearing. The regulations were finally adopted on January 28, 1965 (T.D. 6795).

The statutory provisions of subpart F are extremely complex, and to determine what was meant by section 951(d) and whether the regu-

lations, section 1.951–3, properly carry out its purpose, it is necessary to understand how such provisions work in conjunction with the provisions relating to foreign personal holding companies. Secs. 551–558.

Under these circumstances, we have regulations that were issued contemporaneously with the enactment of the statute, regulations that were prepared by those who were in a position to be familiar with the objectives of the legislation, regulations interpreting extraordinarily complex provisions of the statute, and regulations developed by those officials who spent several years working with the problems of the taxation of controlled foreign corporations. In my judgment, such regulations should be given a great deal of weight by us. See, e.g., *Bingler* v. *Johnson, supra; Commissioner* v. *South Texas Co., supra.*

A careful review of the legislative history of subpart F convinces me that the Treasury had substantial reason for the regulations. While the House was considering the matter, it was apparent that there might be an overlap between the provisions relating to the foreign personal holding companies and the new provisions dealing with the taxation of controlled foreign corporations. To avoid taxing the same income twice, the House provided that income taxable under subpart F should not be taxable under section 551 relating to foreign personal holding companies. H.R. 10650, 87th Cong., 2d Sess., sec. 13 (b)(1) (1962).

In the Senate, the House provision was replaced by what is now section 951(d). However, in the report of the Senate Finance Committee, there is a discussion of the significant changes which the committee proposed to make in the House bill, and that discussion contains no reference to any change of purpose with regard to the coordination of the subpart F provisions and those relating to foreign personal holding companies. S. Rept. No. 1881, *supra*, 1962–3 C.B. 785–786. Moreover, in the general explanation of the provisions in the Finance Committee report, there is also no reference to the problem of coordinating the two sets of provisions. S. Rept. No. 1881, *supra*, 1962–3 C.B. 786–800. In the Statement of the Managers on the Part of the House accompanying the Conference Committee report, there is an extensive discussion of the changes made by the Senate, but here too there is no reference to any change in the provisions relating to the coordination of the controlled foreign corporation provisions with those relating to foreign personal holding companies. Conf. Rept. No. 2508, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 1129, 1157–1164.

It is true that the technical explanation in the Finance Committee report does point out that the Senate used different words than those used by the House, but that statement does not indicate that a different result was intended by the use of different words. S. Rept.

No. 1881, *supra*, 1962–3 C.B. 944. In the opinion of the majority, there is reference to the fact that section 951(c) is similar to section 951(d) and that in connection with section 951(c), the Finance Committee report pointed out that if a foreign investment company elected not to be taxed under subpart F, none of its income would be taxable under those provisions. S. Rept. No. 1881, *supra*, 1962–3 C.B. 944. The majority infers that the committee contemplated the same result when it used similar language in section 951(d), but in connection with the explanation of section 951(d), the committee did not point out that this provision would have the same result. S. Rept. No. 1881, *supra*, 1962–3 C.B. 944. If the committee had contemplated that both provisions would have similar results, it seems as though it would have made a similar observation with respect to both provisions.

Under the House provision, it is clear that if a controlled foreign corporation made an investment in U.S. property or liquidated an investment in a less developed country, the investment or the proceeds of the liquidation would be taxable, even though the corporation was also a foreign personal holding company for that year. See H.R. 10650, *supra* at sec. 13(b)(1). There is nothing in the legislative history to indicate that, by the use of words different from those used in the House, the Senate intended a different result. Yet, by its holding, the majority exempts a shareholder of a controlled foreign corporation from taxation on his pro rata share of previously excluded subpart F income withdrawn from investment in less developed countries and his pro rata share of the corporation's increase in earnings invested in U.S. property, if the controlled foreign corporation happens also to be a foreign personal holding company during the same year. Such result is clearly significantly different from that of the House bill, and it is in conflict with the obvious intent of the Senate to tax both previously excluded income which is withdrawn from investments in less developed countries and income which is invested in U.S. property. S. Rept. No. 1881, *supra*, 1962–3 C.B. 785, 787, 791–794.

The frustration of such congressional purpose effectuated by the majority opinion is amply illustrated by two examples in the Income Tax Regulations. See sec. 1.951–3, examples (4) and (5). Example (4) deals with a controlled foreign corporation that makes an investment in a less developed country during a year in which it is not a foreign personal holding company and thereby defers taxation on the income so invested. In a later year, when the corporation is both a foreign personal holding company and a controlled foreign corporation, it liquidates the investment in the less developed country. It is clear that under subpart F, Congress intended to provide

an incentive for investments in less developed countries by deferring taxation on income that otherwise would be currently taxable, but it is equally clear that Congress intended to tax such income if it was removed from the less developed country. H. Rept. No. 1447, *supra*, 1962-3 C.B. 461-462; S. Rept. No. 1881, *supra*, 1962-3 C.B. 785, 791. The regulations achieve that objective (see sec. 1.955-1(b)(2)(ii), Income Tax Regs.), but the majority holding will result in such income not being taxable when withdrawn from the less developed country.

Example (5) of the regulations deals with a situation similar to that in this case. A corporation realized foreign-source income in years when it was a controlled foreign corporation but not a foreign personal holding company. In a year when it is both a foreign personal holding company and a controlled foreign corporation, it invests such previously untaxed income in U.S. property. The purpose of sections 951 and 956 is to tax the indirect repatriation of foreign-source income by taxing such income when it is invested in U.S. property (H. Rept. No. 1447, *supra*, 1962-3 C.B. 462; S. Rept. No. 1881, *supra*, 1962-3 C.B. 786), and that objective is carried out by the regulations. See secs. 1.951-3 and 1.956-1(b)(2)(ii), Income Tax Regs. However, the majority holds that such income is not taxable.

Considering the undoubted intention of Congress to tax funds withdrawn from investment in less developed countries, if they have been previously excluded, and to tax funds invested in U.S. property, it seems clear that section 951(d) is to be applied on a year-by-year basis to the earnings of a corporation for each taxable year during which the corporation is a controlled foreign corporation. If the earnings for a year are taxed under the foreign personal holding company provisions, then such earnings were not intended to be subject to the provisions of subpart F. However, earnings not so taxed were not intended to be exempted from the operations of subpart F merely because the corporation happens to be both a foreign personal holding company and a controlled foreign corporation.

In my opinion, this Court has abrogated its responsibility by its holding in this case. It is well established that in interpreting legislation, the Court should consider not only the words of the statute, but also the effect of the proposed interpretation of those words. See, e.g., *Corn Products Co.* v. *Commissioner*, 350 U.S. 46 (1955); *Helvering* v. *Gregory*, 69 F. 2d 809 (C.A. 2, 1934), affd. 293 U.S. 465 (1935); *Estate of Robert Rodger Glen*, 45 T.C. 323 (1966). In *Corn Products Co.* v. *Commissioner*, *supra*, the Supreme Court held that the income which the corporation realized from trading in commodity

516

futures should be treated as ordinary income, and not as long-term capital gains. The Court said at 350 U.S. 51–52:

Admittedly, petitioner's corn futures do not come within the literal language of the exclusions set out in * * * [present section 1221]. They were not stock in trade, actual inventory, property held for sale to customers or depreciable property used in a trade or business. But the capital-asset provision * * * must not be so broadly applied as to defeat rather than further the purpose of Congress. * * *

Thus, if the proposed interpretation of a statute clearly fails to carry out the clear purpose of the legislation, then it should be rejected. See *Helvering* v. *Clifford*, 309 U.S. 331 (1940). Yet, in this case, the Court has acted in total disregard of the effect of its interpretation of section 951. To say that, "If its holding fails to accomplish the purpose of Congress, let Congress change the law," represents a failure to recognize what I consider to be our proper role. Such an attitude will impose upon Congress the necessity of enacting corrective legislation in order to avoid the frustration of its purpose. When that purpose can be gleaned as certainly as it can in this case, I believe that it is our responsibility to carry it out and not to force Congress to plug every hole that we create in the statute. I perceive that we have a higher responsibility than to interpret the statute on the basis of a narrow, literal reading of the words and to turn our back on the consequences of such an interpretation.

RAUM and DAWSON, *JJ.*, agree with this dissent.