CLYDE E. STAFFORD AND CAROLYN J. STAFFORD, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent *
Stafford v. Commissioner
Docket No. 13064-90
United States Tax Court
T.C. Memo 1992-637; 1992 Tax Ct. Memo LEXIS 666; 64 T.C.M. (CCH) 1199; November 2, 1992, Filed *666 Decision will be entered under Rule 155. For Clyde E. Stafford, pro se. For Respondent: Elizabeth G. Beck. DAWSON
DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined the following deficiencies in and additions to petitioners' Federal income taxes: Additions to Tax
Sec.
Sec.
Sec.
Year
Deficiency
[1] 6653(b)(1) 6653(b)(2)
6661
1984
$ 71,331
$ 35,666
50 percent
$ 17,833
1985
61,515
30,758
of the
15,379
1986
25,420
19,065
interest due
6,355
on the
deficiency
In the alternative to the 1984 and 1985 additions to tax under section 6653(b)(1) and (2), [1] respondent determined additions to tax under section 6653(a)(1) in the respective amounts of $ 3,566.55 and $ 3,075.75, and under section 6653(a)(2) in the respective amounts of 50 percent of the interest due on $ 71,331 and $ 61,515. In the alternative to the 1986 additions to tax under *667 section 6653(b)(1)(A) and (B), respondent determined a $ 1,271 addition to tax under section 6653(a)(1)(A) and an addition to tax under section 6653(a)(1)(B) in the amount of 50 percent of the interest due on $ 25,420. Respondent has conceded the additions to tax under section 6653(b)(1) and (2) for 1984 and 1985 and section 6653(b)(1)(A) and (B) for 1986. In respondent's answer to petitioners' amendment to petition, respondent inadvertently asserted additions to tax under section 6651(a)(1) for 1984, 1985, and 1986. Hence respondent has conceded these section 6651(a)(1) additions to tax. In addition, respondent has conceded that the determination with respect to Federal income taxes and additions to tax for 1984 was untimely. The period in which an assessment for that year could have been made pursuant to section 6501 *668 expired prior to March 30, 1990, the date respondent mailed the statutory notice of deficiency to petitioners in this case. Thus, there is no deficiency or additions to tax due from petitioners for 1984 and that year is no longer in issue. Consequently, the issues remaining for decision are: (1) Whether respondent is barred by the statute of limitations from assessing and collecting the Federal income tax and additions for petitioners' 1985 tax year; [2] (2) whether petitioners understated the Schedule C gross receipts from their gasoline service station businesses for 1985 and 1986 in the respective amounts of $ 231,620 and $ 201,251.66 which in turn increased their gross income for those years; (3) whether petitioners are entitled to additional Schedule C expenses, including depreciation and cost of goods sold, for the operation of their gasoline service station businesses in 1985 and 1986 in the respective amounts of $ 171,244 and $ 127,665; (4) whether petitioners are entitled to claimed Schedule E expenses with respect to two rental properties for 1985 and 1986 in the respective amounts of $ 11,937 and $ 6,492; (5) whether petitioners are entitled to claimed gambling losses *669 of $ 9,870 for 1985; (6) whether petitioners received unreported gambling income of $ 49,140 in 1986; (7) whether petitioners are entitled to Schedule W married couple deductions for 1985 and 1986 in the respective amounts of $ 1,336 and $ 675; (8) whether petitioners are entitled to investment credits of $ 17,570 for 1985; (9) whether petitioners are liable for increased self-employment taxes pursuant to section 1401 for 1985 and 1986 in the respective amounts of $ 4,563 and $ 3,816; (10) whether petitioners are liable for the additions to tax for negligence or intentional disregard of rules or regulations pursuant to section 6653(a)(1) and (2) for 1985, and section 6653(a)(1)(A) and (B) for 1986; and (11) whether petitioners are liable for the additions to tax for substantial understatements of tax pursuant to section 6661 for 1985 and 1986. *670 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Background
Clyde E. and Carolyn J. Stafford (hereinafter collectively referred to as petitioners) resided in Dallas, Texas, at the time they filed their petition. They timely filed joint Federal income tax returns for 1985 and 1986. On March 30, 1990, respondent mailed a statutory notice of deficiency to petitioners at their last known address. The notice determined deficiencies for 1984, 1985, and 1986. Clyde E. Stafford (hereinafter referred to in the singular as petitioner) is a college graduate who majored in mathematics. For several years prior to operating his own gasoline service station businesses (hereinafter gasoline station businesses or gasoline service station businesses) in 1972, petitioner worked as a bookkeeper for Exxon Co., U.S.A. (hereinafter Exxon). He has always prepared petitioners' joint Federal income tax returns. Carolyn J. Stafford was employed by American Airlines, Inc., during the years in issue. She earned wages of $ 14,295.80 and $ 17,715.03 for 1985 and 1986, respectively, *671 from American Airlines, Inc. I. Gasoline Service Station Businesses
On petitioners' 1985 and 1986 Federal income tax returns, petitioner listed his occupation as "service station". In fact, he operated two gasoline service station businesses during this period: Stafford's Service Station in Dallas, Texas (hereinafter Dallas Station), and Stafford Exxon, in Irving, Texas (hereinafter Irving Station). Petitioners attached Schedules C, Profit or (Loss) From Business or Profession (Sole Proprietorship), to their 1985 and 1986 returns for each of these businesses. During the years in issue, petitioner used the cash method of accounting for Federal income tax purposes and the cost accounting method to value closing inventory at the gasoline service stations. He accepted both cash and credit card payments for sales and services at the stations. Petitioners earned income from gasoline sales, nongasoline products, automotive repairs, State inspections, and vending machine sales. Petitioner did not have cash registers at the gasoline stations. He kept the cash payments that he received in cash boxes at the stations. Petitioner maintained incomplete records of his gasoline service *672 stations' sales and expenses for 1985 and 1986. For example, he did not keep any records of gasoline cash sales or of State motor vehicle inspections. The record in this case is devoid of any testimony or exhibits, other than petitioners' Federal income tax returns, with respect to a majority of the disputed Schedule C expenses for both 1985 and 1986. In the course of investigating petitioners' returns, respondent obtained various third-party records, such as gas distributor invoices, in an attempt to fill this "paper gap". A. The Irving Station
Petitioner has operated the Irving Station since 1977. The Irving Station sold Exxon products during the years in issue. It was open for business from 7 a.m. through 8 p.m., every day of the week. 1985
The Irving Station purchased a total of 701,371 gallons of gasoline in 1985 at a total cost of $ 728,976.39. These purchases included extra unleaded, unleaded, and regular fuel. The cost of the Irving Station's opening and ending inventories for 1985 was the same: $ 10,726. In addition to the gasoline sales, the Irving Station also received income during 1985 from sales of automotive accessories such as accessories-hard *673 parts, antifreeze, motor oils, batteries, tires, and automotive greases. Petitioner purchased these products from Exxon at a total cost of $ 13,190.36 ($ 5,100.44 for oil and $ 8,089.92 for the remaining nongasoline products). Petitioner marked up motor oils by 50 percent. He marked up other nongasoline items by 20 percent. Petitioner also performed State of Texas motor vehicle inspections at the Irving Station. He paid a total of $ 1,127 for State inspection stickers during 1985. The price per inspection sticker was $ 2.75. Petitioner charged $ 7.50 to inspect cars that ran on leaded fuel and $ 10.50 for cars that ran on unleaded fuel. Petitioner kept an incomplete State inspection log that shows inspections beginning in January 1985, and running approximately 300 consecutive days thereafter. The log shows total income of $ 2,579.08 from State motor vehicle inspections for 1985. Petitioners also received income from specialty motor vehicle repairs at the Irving Station. Petitioner did not, however, maintain any records of his income from these repairs. During 1985, he paid $ 11,000 for automotive repair parts. At trial, he estimated that he had an average daily income *674 of between $ 40 and $ 50 from these repairs in 1985. The parties agree that the Irving Station had the following allowable business expenses for 1985: Expenses
Amount
Insurance
$ 2,016
Interest
2,881
Rent
18,960
Wages
9,073
Auto repair parts
11,000
State inspection stickers
1,127
[1] Utilities and telephone 3,476
Taxes
746
Supplies
1,401
Exxon credit card
8,843
Total
$ 59,523
Petitioners did not claim any advertising expenses on their 1985 return. However, the parties agreed that advertising expenses were at issue, and at trial petitioners claimed $ 859.88 of advertising expenses for 1985. Respondent agrees *675 that petitioners are entitled to $ 586.25 of these expenses. The parties have also agreed that, during 1985, petitioners personally consumed $ 2,188 worth of gasoline and nongasoline products that were purchased by the Irving Station. Petitioners erroneously deducted this amount as car and truck expenses on their 1985 Schedule C for the Irving Station. The parties disagree whether additional expenses petitioners claimed on their 1985 return with respect to the Irving Station are allowable. The disputed Schedule C expenses (other than depreciation and cost of goods sold) are as follows: Expense
Amount
Bad debts
$ 1,900
Car and truck expenses
2,188
Insurance
140
Legal and professional services
675
Repairs
2,368
Supplies
161
Utilities and telephone
404
Equipment
2,786
Miscellaneous
1,989
Total    $ 12,611
The claimed bad debt expenses relate to charge-backs from Exxon for credit card sales that Exxon did not accept. Although petitioners claimed a $ 1,900 bad debt expense for 1985, they have only submitted evidence to substantiate $ 208.22 of this amount. There is no evidence in the record with regard to the remaining claimed bad debts. 1986
For 1986, *676 the parties agree that the Irving Station had the following allowable business expenses: Expense
Amount
Insurance
$ 1,349.00
Interest
1,650.00
Rent
18,960.00
Wages
10,400.00
Utilities and telephone
3,394.50
Uniforms
375.00
Equipment
400.00
Miscellaneous
392.00
Taxes
826.00
Exxon credit card charges
7,108.00
Total
$ 44,854.50
The disputed Schedule C expenses (other than depreciation and cost of goods sold) are: Expense
Amount
Bad debts
$ 1,980.00
Car and truck expenses
368.00
Insurance
140.00
Interest
.52
Supplies
562.00
Utilities and telephone
3,373.50
Total
$ 6,424.02
Although petitioners claimed a $ 1,980 bad debt expense for 1986, the record does not substantiate any charge-backs for that year. The cost of the Irving Station's 1986 ending inventory was $ 10,726. B. The Dallas Station
1985
Petitioner has operated the Dallas Station since 1976. In April 1985, petitioner purchased the Dallas Station from Exxon, paying $ 49,971 for the land and buildings. Between April and November, petitioner closed and renovated the station. He installed five reconditioned steel underground storage tanks and made other improvements to the station. *677 On November 5, 1985, the Dallas Station improvements were completed at a total cost of $ 23,600. With regard to the Dallas Station, petitioners claimed a single depreciation deduction of $ 5,111 for 1985, using a $ 92,000 basis and treating the property as 18-year recovery property. (This included depreciation of both the underground storage tanks and the Dallas Station itself.) Petitioners failed to allocate between the value of the Dallas Station's land and its buildings in their claimed cost or other basis on their 1985 return. The Dallas County Tax Assessor-Collector's 1985 Delinquent Tax Roll and Record of Payments stated that approximately 70.9 percent of the Dallas Station property's assessed value is attributable to buildings/improvements ($ 40,720 buildings/improvements value divided by $ 57,460 total assessed value). The Dallas Station sold Exxon products from January through March 1985. When petitioner reopened the station on December 1, 1985, after completing its improvements, he began selling Phillips 66 products at the station. (We will hereinafter refer to the Dallas Station as the Dallas Phillips 66 Station with regard to the period of December 1, 1985, through *678 the end of 1986.) Except for the time when it was closed, the Dallas Station/Dallas Phillips 66 Station was open for business from 7 a.m. through 8 p.m., 6 days a week. The cost of the opening and closing inventories of the Dallas Station during the first quarter of 1985 was $ 3,872 and zero, respectively. The cost of the ending inventory as of December 31, 1985, was $ 2,600. The Dallas Station purchased a total of 80,393 gallons of gasoline in 1985, at a total cost of $ 79,527.45. These purchases included extra unleaded, unleaded, and regular fuel. Petitioners' total income in 1985 from gasoline sales at the Dallas Station was $ 90,487.93. S & S Petroleum, Inc., delivered 46,776 gallons of Phillips 66 gasoline to the Dallas Phillips 66 Station during November and December 1985. This gasoline consisted of 12,820 gallons of regular, 21,340 gallons of unleaded, 6,353 gallons of extra unleaded, and 6,263 gallons of diesel fuel. Petitioners' 1985 income from gasoline sales at the Dallas Phillips 66 Station, prior to adjustment for ending inventory, was $ 52,269.42. The parties agree that the Dallas Station had allowable business expenses of $ 1,288 for interest and $ 427 for *679 utilities and telephone for the first quarter of 1985. They also agree that the Dallas Phillips 66 Station had an allowable business expense of $ 503 for utilities and telephone for the last quarter of 1985. The disputed 1985 Schedule C expenses (other than depreciation and cost of goods sold) with respect to the Dallas Station total $ 1,799, consisting of $ 1,750 for rent on business property and $ 49 for utilities and telephone expenses. The disputed 1985 Schedule C expenses (other than depreciation and cost of goods sold) with respect to the Dallas Phillips 66 Station are: Expense
Amount
Supplies
$ 286
Utilities and telephone
59
Trash haul
150
Equipment
1,575
Miscellaneous
689
Total
$ 2,759
1986
In 1986, the Dallas Phillips 66 Station purchased $ 5,988 of gasoline from Twin Lakes Petroleum. It also purchased $ 334,587.35 of gasoline from S & S Petroleum, Inc., consisting of 145,584 gallons of leaded regular, 192,478 gallons of unleaded regular, 54,023 gallons of extra unleaded, and 9,375 gallons of diesel fuel. The parties agree that the Dallas Phillips 66 Station had the following allowable business expenses for 1986: Expense
Amount
Utilities and telephone
$ 1,355.50
Mortgage interest
4,140.00
Supplies
890.00
Trash hauling
528.00
Taxes
726.00
Total
$ 7,639.50
*680 The disputed 1986 Schedule C expenses (other than depreciation and cost of goods sold) with respect to the Dallas Phillips 66 Station relate to additional utilities and telephone expenses of $ 1,152.50. For 1986, petitioners claimed a single depreciation deduction of $ 5,111 for the Dallas Phillips 66 Station, using a $ 92,000 basis, and treating the property as 18-year property. (This included depreciation of the station and the underground storage tanks.) Petitioners failed to allocate between the value of the station's land and buildings in the claimed basis on their 1986 return. The cost of the ending inventory of the Dallas Phillips 66 Station for 1986 was $ 1,280. Respondent's Determination of Petitioners' 1985 Gasoline Service Station Income
Respondent determined petitioners' 1985 gross income from gasoline sales by using two computational formulas. The first formula considered the gallons of gasoline delivered to each station and multiplied that number by the U.S. Department of Labor Bureau of Labor Statistics (BLS) Labstat Computer Database average retail price per gallon for the particular month (or other time period) and the particular types of gasoline (i.e., *681 leaded regular, unleaded regular, extra unleaded, or diesel), sold in the Dallas-Fort Worth, Texas, area for the relevant time period. The BLS retail prices included prices from full-service and self-service stations and also considered discounts for cash payments as opposed to credit card payments. (When compared to petitioner's Exxon credit card receipts from one customer for December 1985, the BLS retail prices were consistently less than the credit card prices for all types of gasoline sold by petitioner.) Respondent's second computational formula determined gross income from the sale of inventory. Beginning and ending inventories were examined and any difference between them was taken into account. Irving Station
As described above, respondent used petitioner's invoices for Exxon gasoline purchases and the Consumer Price Index (CPI) from the BLS to determine the Irving Station's 1985 gasoline sales income. This calculation yielded a total gross receipts amount of $ 811,879. Next, income from sales of inventory was determined. Because the beginning and ending inventories for the Irving Station were the same, no adjustment was made for the sale of inventory at the *682 station. Total income from Exxon gasoline sales was thus determined to be $ 811,879. Respondent calculated the 1985 cost of goods sold for the Irving Station by using petitioners' Federal income tax return, beginning and ending inventories (as stipulated), invoices from Exxon purchases, and adjusting (subtracting) for petitioners' personal consumption of gasoline and nongasoline products. This calculation yielded a total cost of goods sold of $ 739,978. Dallas Station
Respondent also used petitioner's invoices for Exxon purchases and the CPI from the BLS table to determine 1985 gasoline sales income for the Dallas Station. This calculation yielded a total gross receipts amount of $ 90,488. Next, income from the sale of inventory was determined. Because the beginning and ending inventories for the Dallas Station were different, income from the sale of inventory was calculated. According to this adjustment, petitioners received an additional $ 4,406 of income from inventory sales. Total income from Exxon gasoline sales was thus determined to be $ 94,894. Respondent calculated the 1985 cost of goods sold for the Dallas Station by using petitioners' Federal income tax return, *683 beginning and ending inventories (as stipulated), and invoices from Exxon purchases. This calculation yielded a total cost of goods sold of $ 83,399. Dallas Phillips 66 Station
Respondent similarly determined petitioners' total 1985 gross receipts from gasoline sales and cost of goods sold at the Dallas Phillips 66 Station. Total reconstructed income from gasoline sales at the Dallas Phillips 66 Station for 1985 was determined to be $ 49,367, and the 1985 reconstructed cost of goods sold for the station totaled $ 46,017. Total 1985 Income from Gas Stations
Respondent determined petitioners' total 1985 income from State motor vehicle inspections by extrapolation of the information contained in petitioners' incomplete vehicle inspection log to a total year's amount. Pursuant to respondent's calculation, petitioners' 1985 taxable income from State motor vehicle inspections was $ 3,108. [3] Also, pursuant to petitioner's statements, respondent reconstructed petitioners' annual income from specialty repairs, and determined that it was $ 14,600. *684 Respondent reconstructed petitioners' income from sales of nongasoline products by multiplying petitioner's markup percentage [4] by the cost of items purchased during 1985. Pursuant to respondent's recalculation, petitioners' 1985 gross income from these sales totaled $ 17,358.56. Respondent also recomputed petitioners' 1985 gross income from labor related to sales of nongasoline products, and determined that it totaled $ 5,276. Thus, respondent determined that petitioners' reconstructed gross income from nongasoline products totaled $ 22,634. The following chart summarizes petitioners' total gross receipts for 1985, as reported by petitioners and as reconstructed by respondent: [5]
Total Gross Receipts as Stated on Petitioners' 1985 Return
Wages
$ 14,296
Interest
123
Other income
117,896
Schedule E (Rental income)
5,800
Schedule C gross receipts
Irving Station    $ 720,890
Dallas Station    27,002
Dallas Phillips 66 Station    14,782
TOTAL    762,674
Total per return gross receipts
$ 900,789
Respondent's Reconstruction of Petitioners' 1985 Total Gross Receipts
Wages
$ 14,296
Interest
123
Other income
117,896
Schedule E (Rental income)
5,800
Schedule C gross receipts
Irving Station-gasoline sales    $ 811,879
Dallas Station-gasoline sales    94,894
Dallas Phillips 66    Station-gasoline sales      49,367
State inspection    3,108
Other nongasoline income    22,634
Specialty repair income    14,600
Less: personal consumption    (2,188)
TOTAL    994,294
Total reconstructed gross receipts
$ 1,132,409
*685 Respondent's Determination of Petitioners' 1986 Gasoline Service Station Income
With regard to 1986, petitioner had very few or no invoices for his Exxon and Phillips 66 purchases and sales. However, on January 17, 1987, petitioner prepared a financial statement of his 1986 gasoline service station businesses for purposes of obtaining a loan from Independence Mortgage, Inc. Irving Station
Respondent reconstructed petitioners' 1986 income from the Irving Station based on information contained in the January 17, 1987, financial statement. Pursuant to this information, respondent reconstructed petitioners' 1986 gross income from the Irving Station as follows: Type of Income
Amount
Gasoline sales
$ 786,629.32
Labor
17,109.00
Goods sold
3,875.25
Total
$ 807,613.57
Petitioners reported a $ 720,875.15 cost of goods sold for the Irving Station on their *686 1986 return. Respondent did not make any adjustment to this amount in the notice of deficiency. Dallas Phillips 66 Station
Respondent reconstructed petitioners' 1986 gross receipts from gasoline sales at the Dallas Phillips 66 Station by once again applying the BLS average annual retail price in the Dallas-Ft. Worth area for each type of gasoline delivered to the Dallas Phillips 66 Station during 1986 (as indicated by the business records of S & S Petroleum, Inc., and Twin Lakes Petroleum), and then making an adjustment for the sale of inventory. Thus, respondent reconstructed petitioners' 1986 total gross receipts from gasoline sales at the Dallas Phillips 66 Station to be $ 342,727. This amount is less than the amount listed on petitioners' February 18, 1987, financial statement for this station. Respondent reconstructed petitioners' Dallas Phillips 66 Station income from labor and sales of nongasoline products to be $ 16,307 and $ 1,802.66, respectively. Thus, petitioners' total 1986 reconstructed income from sales at the Dallas Phillips 66 Station was $ 360,836.66. Respondent calculated the 1986 cost of goods sold for the Dallas Phillips 66 Station by utilizing the *687 gross profit percentage for gallons purchased from S & S Petroleum, Inc., and Twin Lakes Petroleum and then making inventory adjustments. Petitioners' 1986 reconstructed cost of goods sold for the Dallas Phillips 66 Station totaled $ 307,700. Total 1986 Income from Gasoline Service Stations
On their 1986 Federal income tax return, petitioners reported gross income from the Irving Station and Dallas Phillips 66 Station in the respective amounts of $ 777,611.57 and $ 189,587. Respondent determined that petitioners' 1986 income from these stations was $ 807,613.57 and $ 360,836.66, respectively. Accordingly, pursuant to respondent's computations, petitioners understated their total gross income from 1986 sales at these stations in the total amount of $ 201,251.66 ($ 30,002 for the Irving Station, plus $ 171,249.66 for the Dallas Phillips 66 Station). II. Rental Properties
A. House
In 1972, petitioners paid $ 26,700 for a personal residence (hereinafter referred to as the house property) located at 2718 Meadow Harvest, in Dallas, Texas. In 1983, petitioners paid $ 5,000 to add a patio cover to the house property. From July 1, 1985, through 1986, petitioners *688 rented the house property to third parties. The Dallas County Tax Assessor-Collector's 1985 Tax Roll and Record of Payments indicates that 86.3 percent of the house property's assessed value is attributable to building/improvements ($ 50,210 building/improvements value divided by $ 58,210 total assessed value). B. Church
In 1980, petitioner paid $ 30,000 for a parcel of real property that included a church (hereinafter referred to as the church property) located at 4842 Don Drive, in Dallas, Texas. During the years in issue, petitioners rented the church property to third parties. The Dallas County Tax Assessor-Collector's 1985 Tax Roll and Record of Payments indicates that 00.0 percent of the church property's assessed value is attributable to building/improvements ($ 0 building/improvements value divided by $ 17,880 total assessed value). Schedule E Expenses for the House and Church Properties
With respect to the Schedule E expenses (other than depreciation) relating to the house and church properties claimed by petitioners on their 1985 and 1986 Federal income tax returns, the parties have stipulated that petitioners are entitled to the following business expenses: *689 1985
Expense
Amount
Insurance
$ 920
Mortgage interest
1,834
Taxes
475
Total
$ 3,229
1986
Expense
Amount
Commissions
$ 95
Insurance
258
Mortgage interest
1,285
Interest - First Texas Savings
1,913
Taxes
947
Total
$ 4,498
The disputed Schedule E expenses (other than depreciation) are as follows: 1985
Expense Claimed
Property
House
Church
Cleaning and maintenance
$ 190
$ 275
Repairs
2,280
2,450
Advertising
120
130
Garage door
--
550
Plumbing rework
1,600
--
Subtotal    $ 4,190
$ 3,405
Total      $ 7,595
1986
Expense Claimed
Property
House
Church
Cleaning and maintenance
$ 482
$ 283
Plumbing rework
1,382
312
Subtotal    $ 1,864
$ 595
Total      $ 2,459
There is no evidence in the record substantiating the disputed Schedule E expenses for 1985 and 1986. The parties agree that petitioners are entitled to depreciate, on a straight line basis, the buildings located on the house and church properties. On their 1985 and 1986 returns, petitioners claimed straight line depreciation deductions in the amounts of $ 2,317 for the house property and $ 2,333 for *690 the church property for each year. These deductions were based on treating the properties as 18-year real property under the Accelerated Cost Recovery System (ACRS). In the notice of deficiency, respondent disallowed these deductions in part. Petitioners failed to allocate between the value of the land and buildings in these properties' claimed cost or other basis on their 1985 and 1986 returns. III. Gambling Income and Expenses
In 1985 and 1986, petitioner was a casual gambler. He placed wagers on horse races at approximately five different race tracks during these years, including Santa Anita, Oaklawn, Louisiana Downs, Red River, and Oak Tree. Racetrack wagers are recorded on gambling tickets called totes. Winning totes must be turned in to a racetrack in exchange for the amount won. Losing totes are often retained by bettors to record their losses. Racetracks are required to report to the Internal Revenue Service, on Forms W-2G, all winning totes cashed in excess of $ 600 and are required to withhold taxes on winnings in excess of $ 1,000. Petitioners maintained no formal record of gambling winnings or losses for 1985 or 1986. Although they did not produce any *691 losing totes for 1985, they did produce losing totes for 1986 totaling $ 51,372. 1985
On petitioners' 1985 return, they reported $ 117,896 as gambling income from one "Pick Six" wager, and attached a Form W-2G from Louisiana Downs, Inc., for this amount. On Schedule A, Miscellaneous Deductions, attached to their 1985 return, petitioners listed $ 9,870 as "Loss & Expenses on American Express & Visa" and deducted this amount as gambling losses. In the notice of deficiency respondent disallowed this deduction in full for lack of substantiation. 1986
On their 1986 return, petitioners reported a total of $ 47,550.20 in gambling income from Louisiana Downs, Inc. They attached four separate Forms W-2G to evidence these winnings, which list "Super 6" as the type of wagers. On the Schedule A, Miscellaneous Deductions, attached to their 1986 return, petitioners listed $ 61,783.15 as "Loss & Expenses at La. Downs on Visa & American Express" and took a $ 47,550 deduction practically equal to their total reported winnings. Petitioners based the $ 47,550 deduction on their 1986 losing totes (but limited this deduction to their reported gambling income). Using the totes presented *692 by petitioners, respondent determined that petitioner placed over 22,000 bets on approximately 152 days in 1986 at five different racetracks. Respondent then determined that petitioners had additional 1986 gambling income of $ 49,140. [6] Respondent also allowed petitioners an additional $ 14,233 deduction for unclaimed gambling losses for that year. *693 IV. Schedule W Married Couple Deductions
On their 1985 and 1986 Federal income tax returns, petitioners claimed $ 93.52 and $ 1,097.32, respectively, as Schedule W married couple deductions. In the notice of deficiency, respondent adjusted these deductions to be $ 1,336 and $ 675, respectively, for 1985 and 1986. These adjustments reflected changes in petitioners' qualified earned income based on respondent's recomputation of petitioners' 1985 and 1986 gasoline service station income. V. Investment Credit
On petitioners' 1985 Federal income tax return, they claimed $ 17,570 in investment credits relating to buildings located on the church property, the house property, and the Dallas Station property. Respondent disallowed these credits in the notice of deficiency. VI. Self-Employment Taxes
On their 1985 and 1986 Federal income tax returns, petitioners listed $ 110.35 and $ 1,349.70, respectively, as self-employment taxes. In the notice of deficiency respondent increased petitioners' self-employment income in the respective amounts of $ 4,563 and $ 3,816, for 1985 and 1986. These adjustments were based on respondent's calculation of additional income *694 and decreased by additional allowable expenses from petitioners' gasoline service station businesses. OPINION Issue 1. Statute of Limitations for 1985
The first issue is whether the statute of limitations bars respondent from assessing and collecting Federal income tax and additions thereto for petitioners' 1985 tax year. Petitioners contend that assessment and collection for 1985 are barred by section 6501(a). Petitioners timely filed their 1985 Federal income tax return on or before April 15, 1986. Respondent's notice of deficiency for 1985 was sent to petitioners by certified mail on March 30, 1990, after the general 3-year period of limitations had expired. See sec. 6501(a). Respondent contends that the notice was timely because the 6-year statute of limitations provided by section 6501(e)(1)(A) is applicable to petitioners' 1985 tax year. Respondent argues that the 6-year statute of limitations would have expired on April 15, 1992, but that the notice of deficiency was mailed on March 30, 1990, prior to the expiration of the 6-year period. Petitioners contend that the 6-year statute of limitations does not apply to their 1985 tax year. They state that they properly *695 determined their 1985 gasoline stations' gross receipts, and thereby their 1985 gross income, so that the 6-year statute of limitations would not be applicable. Section 6501(a) provides a general rule that any income tax imposed by the Internal Revenue Code must be assessed within 3 years after the date a taxpayer's return is filed. There are, however, exceptions to this general rule. One exception is stated in section 6501(e)(1)(A), which provides that if a taxpayer omits from gross income a properly includable amount in excess of 25 percent of the gross income stated in the taxpayer's return, an assessment may be made at any time within 6 years after the return is filed. In the case of a trade or business, "gross income" is defined in section 6501(e)(1)(A)(i) as: the total of the amounts received or accrued from the sale of goods or services (if such amounts are required to be shown on the return) prior to diminution by the cost of such sales or services * * * See, e.g., Insulglass Corp. v. Commissioner, 84 T.C. 203, 210 (1985); Schneider v. Commissioner, T.C. Memo. 1985-139. The Commissioner bears the burden *696 of proving that the extended 6-year period of limitations is applicable. Wood v. Commissioner, 245 F.2d 888, 893-895 (5th Cir. 1957), affg. in part and revg. in part T.C. Memo. 1955-301; Gray v. Commissioner, 56 T.C. 1032, 1059 (1971), revd. and remanded on another issue 561 F.2d 753 (9th Cir. 1977); Stratton v. Commissioner, 54 T.C. 255, 289 (1970), modified 54 T.C. 1351 (1970); Bardwell v. Commissioner, 38 T.C. 84, 92 (1962), affd. 318 F.2d 786 (10th Cir. 1963). The Commissioner must prove (1) that the amounts of income that were not reported were properly includable in gross income, and (2) that an amount in excess of 25 percent of the amount of gross income shown on the return was omitted. Estate of Whitlock v. Commissioner, 494 F.2d 1297 (10th Cir. 1974), affg. in part and revg. in part 59 T.C. 490 (1972); Burbage v. Commissioner, 82 T.C. 546, 553 (1984), affd. *697 774 F.2d 644 (4th Cir. 1985). Respondent has carried the burden of proof on this issue. The determinative question is whether petitioners omitted from gross income (as that term is specially defined in section 6501(e)(1)(A)) an amount in excess of 25 percent of the gross income stated on their 1985 return. In our consideration of issue 2, which follows, we conclude that, based on respondent's reconstruction of petitioners' gasoline service station income for 1985, petitioners omitted from gross income an amount in excess of 25 percent of the gross income stated on their 1985 return. [7] Accordingly, the 6-year period provided by section 6501(e)(1)(A) is applicable and the assessment and collection of the deficiency and additions to tax for 1985 are not barred by the statute of limitations. *698 Issue 2. Schedule C Gross Receipts from Gasoline Service Station Businesses
The second issue is whether petitioners understated the 1985 and 1986 Schedule C gross receipts from their gasoline service station businesses. They contend that they reported all of their gross receipts. Respondent's position is that petitioners understated their 1985 and 1986 Schedule C gross receipts by the respective amounts of $ 231,620 and $ 201,251.66. Section 6001 requires all taxpayers to maintain sufficient records to determine their correct tax liabilities. When a taxpayer fails to keep adequate records, the Commissioner is authorized to determine the existence and amount of the taxpayer's income by any method that clearly reflects income. Sec. 446(b); Holland v. United States, 348 U.S. 121 (1954); Mallette Bros. Const. Co. v. United States, 695 F.2d 145, 148 (5th Cir. 1983); Webb v. Commissioner, 394 F.2d 366, 371-372 (5th Cir. 1968), affg. T.C. Memo. 1966-81. The reconstruction of income need only be reasonable in light of all surrounding facts and circumstances. *699 Giddio v. Commissioner, 54 T.C. 1530, 1533 (1970); Schroeder v. Commissioner, 40 T.C. 30, 33 (1963). The Commissioner is given latitude in determining which method of reconstruction to apply when a taxpayer fails to maintain records. Petzoldt v. Commissioner, 92 T.C. 661, 693 (1989). Once the Commissioner has reconstructed a taxpayer's income, the burden is on the taxpayer to demonstrate that the Commissioner's determination is erroneous. Mallette Bros. Const. Co. v. United States, supra at 148. Respondent reconstructed petitioners' gasoline service station income because petitioners' books and records were incomplete. As set out in detail in our Findings of Fact, respondent used in the reconstruction certain statistics, petitioner's own statements, the financial statement attached to petitioner's loan application, and third party records and statements. [8] This Court and the United States Court of Appeals for the Fifth Circuit, where an appeal in this case would lie, have approved the use of Bureau of Labor Statistics indexes, such as the consumer *700 price index, as well as information based upon third party statements. See Moore v. Commissioner, 722 F.2d 193 (5th Cir. 1984), affg. T.C. Memo. 1983-20; Burgo v. Commissioner, 69 T.C. 729, 749 (1978); Giddio v. Commissioner, supra.We have also permitted the use of loan application financial statements in reconstructing income. See, e.g., Miller v. Commissioner, T.C. Memo. 1983-73, affd. without published opinion (9th Cir., Aug. 14, 1984).
Based on the evidence presented, *701 we conclude that respondent used reasonable methods to reconstruct petitioners' income from the gasoline service stations for both 1985 and 1986, especially in light of petitioners' lack of adequate books and records. Respondent's agents reconstructed petitioners' income after a careful and thorough investigation. The approach was conservative and the results were entirely reasonable under the circumstances. The only evidence petitioners presented on this issue was petitioner's own testimony and several hand-written charts. Petitioners offered no records to substantiate their argument that all of their income was reflected on their returns. Neither did petitioners substantiate their contention that the information on their January 17, 1989, financial statement was only a projection of the 1986 gasoline service station income, and not a true reflection of that income. Petitioner's self-serving testimony, unsupported by any other evidence, is insufficient to overcome respondent's proof that petitioners understated their 1985 and 1986 Schedule C gross receipts in the respective amounts of $ 231,620 and $ 201,251.66. [9]
*702 Issue 3. Schedule C Expenses for Gasoline Service Station Businesses
The third issue is whether petitioners are entitled to additional Schedule C expenses, including depreciation and cost of goods sold, for the operation of their gasoline service station businesses in 1985 and 1986 in the respective amounts of $ 171,244 and $ 127,665. Petitioners contend that they are entitled to all of their claimed expenses. Respondent disagrees. Deductions are a matter of legislative grace. New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). Taxpayers bear the burden of establishing that they are entitled to the claimed deductions. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). A taxpayer must substantiate the amounts which give rise to a claimed deduction, and if the taxpayer does not, respondent is justified in denying the deduction. Hradesky v. Commissioner, 65 T.C. 87, 90 (1975), affd. per curiam 540 F.2d 821 (5th Cir. 1976). The inability to produce records does not relieve the taxpayer of this burden of proof. Estate of Mason v. Commissioner, 64 T.C. 651 (1975), *703 affd. per order 566 F.2d 2 (6th Cir. 1977); Figueiredo v. Commissioner, 54 T.C. 1508 (1970), affd. per order (9th Cir., Mar. 14, 1973). 1. Schedule C Expenses Other Than Depreciation and Cost of Goods Sold
As stated in our Findings of Fact, the 1985 and 1986 disputed expenses (other than depreciation and cost of goods sold) involve a variety of items including bad debts, car and truck expenses, insurance, legal and professional services, repairs, supplies, utilities and telephone, and equipment. The evidence in the record is very sparse with regard to these disputed expenses. a. Bad Debt Expenses
The claimed bad debt expenses relate to charge-backs from Exxon for 1985 credit card sales that Exxon did not accept. Section 166(a) allows a deduction for business debts that become wholly or partially worthless during the taxable year. Worthlessness is a question of fact which the taxpayer has the burden of proving by a preponderance of the evidence. Crown v. Commissioner, 77 T.C. 582, 598 (1981). The worthlessness of a debt must be determined by an examination of all the circumstances. *704 Dallmeyer v. Commissioner, 14 T.C. 1282, 1291 (1950). Circumstances such as the solvency of the debtor and efforts to collect the debt have been considered in determining the worthlessness of a debt. The net result of the charge-backs at issue was that petitioner was responsible for the collection of the debts. There is no evidence in this record of any attempts by petitioner to collect on these charges or of any circumstances of the debtors showing uncollectibility. Thus, we hold that petitioners have not sustained their burden of proving that the claimed bad debts became worthless in 1985 or 1986. b. Utility and Telephone Expenses
As stated in our Findings of Fact, petitioners' utility and telephone bills reflect charges for both business and personal usage. Petitioners did not, however, keep any records that allocated between their business and personal usage. Respondent has allowed petitioners approximately 90 percent of both the utility and telephone expenses for 1985, and 51 percent of these expenses for 1986. Because petitioners failed to present evidence to establish their entitlement to utility and telephone expenses in excess *705 of these amounts, we sustain respondent on this issue. c. Advertising Expenses
Petitioners did not claim any advertising expenses on their 1985 and 1986 returns. However, the parties agreed that advertising expenses are in dispute, and, at trial, petitioners claimed $ 859.88 of advertising expenses for 1985. On brief, respondent agreed that petitioners are entitled to $ 586.25 of this claimed expense, but disputed the remaining $ 273.63. Based on this record, we agree with respondent that petitioners are not entitled to the additional $ 273.63 of advertising expenses. The evidence supports the $ 586.25 of agreed expenses, but petitioners have failed to substantiate their remaining claimed deductions. We therefore sustain respondent on this issue. d. Remaining Disputed Expenses
Petitioners have failed to substantiate their remaining disputed expenses for 1985 and 1986 or to prove that these expenses were ordinary and necessary to their gasoline service station businesses. See sec. 162. They have failed to carry their burden of proof as to these expenses, and we therefore uphold respondent's determinations with regard to these remaining disputed expenses. 2. *706 Schedule C Depreciation Expenses
a. Dallas Phillips 66 Station
On both their 1985 and 1986 returns, petitioners claimed a total $ 5,111 depreciation deduction with regard to the Dallas Phillips 66 Station, using a $ 92,000 basis applied to 18-year property. Respondent disallowed portions of these depreciation deductions contesting petitioners' choice of basis, useful life, and method of depreciation. Petitioners argue that they correctly determined their depreciation deductions. They have the burden of proof. Rule 142(a). A deduction for depreciation is limited to a reasonable allowance for exhaustion and wear and tear of property used in a trade or business or held for the production of income. Sec. 167(a). Land is not depreciable. See Hoboken Land & Improvement Co. v. Commissioner, 138 F.2d 104 (3d Cir. 1943), affg. 46 B.T.A. 495 (1942). Petitioners paid $ 49,971 for the Dallas Station/Dallas Phillips 66 Station property, [10] including the land and buildings. Section 1.167(a)-5, Income Tax Regs., provides that: In the case of the acquisition on or after March 1, 1913, of a combination of depreciable and *707 nondepreciable property for a lump sum, as for example, buildings and land, the basis for depreciation cannot exceed an amount which bears the same proportion to the lump sum as the value of the depreciable property at the time of acquisition bears to the value of the entire property at that time. * * * Pursuant to this regulation, respondent argues that, for purposes of depreciation, the amount that petitioners paid for the Dallas Station/Dallas Phillips 66 Station must be allocated between the land and buildings. We agree. Because the only reliable evidence in the record showing an allocation between the value of the station's land and buildings is the Dallas County Tax Assessor-Collector's 1985 Tax Roll and Record of Payments statement (which indicates that 70.9 percent of the property's assessed value is attributable to buildings/improvements), we sustain respondent's determination of petitioners' depreciable basis as $ 35,429.44 ($ 49,971 purchase price x 70.9 percent = $ 35,429.44). See, e.g., Conroe Office Building, Ltd. v. Commissioner, T.C. Memo. 1991-224. *708 Petitioners used an 18-year useful life to depreciate the station. For property placed in service after May 8, 1985, and before January 1, 1987, the unadjusted basis of real property is recoverable under section 168 over a period of 19 years. See Simplification of Imputed Interest Rules Act of 1985, Pub. L. 99-121, sec. 103(a), 99 Stat. 505, 509. The Dallas Phillips 66 Station was placed in service during the last half of 1985. As a result, respondent recalculated petitioners' depreciation of the station by treating it as 19-year real property subject to ACRS under section 168 and the regulations thereunder. Respondent also applied the half-year convention rule to the property for 1985 (because it was placed in service during the last half of that year), which in this instance works in petitioners' favor and therefore we will not disturb such determination. Compare section 168(b)(2)(A) which prescribes a mid-month convention for 19-year property. Respondent's adjustments are presumptively correct, and petitioners have not introduced any evidence to establish the incorrectness of respondent's recalculation of these deductions. We therefore sustain respondent's determination *709 regarding the allowable depreciation deductions for the Dallas Phillips 66 Station for 1985 and 1986. b. Storage Tanks at Dallas Phillips 66 Station
Petitioner paid $ 23,600 for the labor, equipment, and materials associated with the underground gasoline storage tanks at the Dallas Phillips 66 Station. Petitioners included these gasoline storage tanks as part of the $ 92,000 basis that they depreciated on their 1985 and 1986 returns with regard to the Dallas Phillips 66 Station, and treated this as 18-year real property on their 1985 and 1986 returns. As stated above, petitioners' 1985 and 1986 reported basis and method of depreciation were erroneous. However, respondent does not dispute that petitioners are entitled to some depreciation deductions with regard to these tanks. The parties have stipulated that the storage tanks constituted "improvements to the real estate." The tanks were installed underground with "poured reinforced concrete over tanks and pipe chases". Because the parties agree that the storage tanks are improvements to real estate (Dallas Phillips 66 Station), we conclude that section 168 is applicable and the unadjusted basis of the storage tanks is *710 recoverable over a period of 19 years (for property placed in service after May 8, 1985, and before January 1, 1987). See Simplification of Imputed Interest Rules Act of 1985, Pub. L. No. 99-121, sec. 103(a), 99 Stat. 505, 509. Also, the tanks were placed in service during the last half of 1985. We assume that respondent, in the Rule 155 computations, will similarly apply the one-half year convention as respondent did in the depreciation of the Dallas Phillips 66 Station. 3. Cost of Goods Sold Expenses
As described in our Findings of Fact, based upon petitioners' reconstructed gross income from the gasoline service stations, respondent increased petitioners' 1985 and 1986 Schedules C cost of goods sold expenses. Because we have sustained respondent's determinations regarding the increased Schedules C gross income, we also sustain respondent's recalculation of the cost of goods sold expenses for 1985 and 1986. Issue 4. Schedule E Expenses for Rental Properties
The fourth issue is whether petitioners are entitled to claimed Schedule E expenses with respect to two rental properties for 1985 and 1986 in the respective amounts of $ 11,937 and $ 6,492. Respondent disallowed *711 these expenses for lack of substantiation. Petitioners contend that they are entitled to the full amount of these claimed expenses. Petitioners have the burden of proving that respondent's determinations are erroneous. 1. Schedule E Expenses (Other Than Depreciation)
The disputed Schedule E expenses (other than depreciation) relating to petitioners' house and church properties for 1985 and 1986 total $ 7,595 and $ 2,459, respectively. [11] There is no evidence in the record relating to these expenses. Because petitioners have failed to substantiate the disputed expenses, or to show that these expenses were ordinary and necessary to petitioners' rental businesses pursuant to section 162, we sustain respondent with regard to these items. See Rule 142(a); see also sec. 6001. 2. Schedule E Depreciation Expenses
On their 1985 and 1986 returns, petitioners claimed depreciation deductions of $ 2,317 for the house property and $ 2,333 for the *712 church property for each year. Petitioners treated the properties as 18-year real property under ACRS. Respondent disallowed a portion of these depreciation deductions. Respondent asserts that petitioners used an incorrect basis, an improper method of depreciation, an incorrect useful life, and failed to properly apply the half-year convention to the properties. Petitioners paid a total of $ 26,700 in 1972 for the house property and added a patio cover to the house in 1983 at a cost of $ 5,000. Petitioners paid $ 30,000 for the church property in 1980. The depreciable basis of purchased property is, in general, its cost. Secs. 167(g), 1011, 1012; Weis v. Commissioner, 94 T.C. 473, 482 (1990). However, as we have already discussed, when a combination of depreciable and nondepreciable property is purchased for a lump sum, the lump sum must be allocated between the two types of property to determine their respective costs. In making this allocation, the basis of the depreciable property cannot exceed an amount which bears the same proportion to the lump sum as the value of the depreciable property at the time of acquisition bears to the entire *713 value of the property at that time. Sec. 1.167(a)-5, Income Tax Regs. Since land is not subject to depreciation, the purchase price must be allocated between the value of the land and the building. Hoboken Land & Improvement Co. v. Commissioner, 138 F.2d 104 (3d Cir. 1943), affg. 46 B.T.A. 495 (1942). Petitioners bear the burden of proving that respondent's allocation is incorrect. Rule 142(a); see Elliott v. Commissioner, 40 T.C. 304, 313 (1963). The only evidence that was presented in this case to provide an allocation of value between land and buildings for the house and church properties is the Dallas County Tax Assessor-Collector's 1985 Tax Roll and Record of Payments statement. For the house property, the assessor's statement indicates that 86.3 percent of the property's assessed value is attributable to building/improvements. For the church property, the assessor's statement indicates that 00.0 percent of the property's assessed value is attributable to building/improvements. Because of the sparse evidence before us, we sustain respondent's use of the local and county taxing authorities' *714 documents to determine petitioners' depreciable bases in the house and church properties. See, e.g., Conroe Office Building, Ltd. v. Commissioner, T.C. Memo. 1991-224; see also Rule 142(a). Thus, petitioners' depreciable basis in the house property is $ 28,042.10 ($ 26,700 X 86.3 percent = $ 23,042.10 + $ 5,000 = $ 28,042.10), and petitioners have a zero depreciable basis in the church property.[12] Consequently, petitioners are entitled to some depreciation deductions for 1985 and 1986 with regard to the house property, but no deductions for the church property.
The proper method of depreciation depends upon when the properties were placed in service. *715 Property is "placed in service" when it is "first placed in a condition or state of readiness and availability for a specifically assigned function, whether in a trade or business, in the production of income, in a tax-exempt activity, or in a personal activity." Sec. 1.167(a)-11(e)(1), Income Tax Regs.; see Piggly Wiggly Southern, Inc. v. Commissioner, 84 T.C. 739, 745-746 (1985), affd. on another issue 803 F.2d 1572 (11th Cir. 1986). Respondent determined that the house property was placed in service prior to January 1, 1981, [13] and, as a result, that petitioners must recover their depreciable basis in the house property through depreciation deductions pursuant to section 167 and the regulations thereunder. Under section 167, depreciation deductions are available over the useful life of the property, which is the period over which the property is reasonably expected to be useful in the taxpayer's trade or business or for the production of income. Sec. 1.167(a)-1(b), Income Tax Regs. The house property's appropriate useful life is 45 years. See Rev. Proc. 72-10, 1972-1 C.B. 721, 731 *716 (asset guideline Class 65.32 (Building Services for residential purposes, Dwellings)). On a straight line basis, a full year's depreciation rate is 2.2 percent. Because the house property was first used in a trade or business/income producing activity in July 1985, its 1985 depreciation deduction must be pro rated for the number of months in use. See sec. 1.167(b)-1(b), Income Tax Regs., Example (1). Accordingly, respondent determined that petitioners are entitled to only one-half year's depreciation (or 1.1 percent of $ 28,042.10 = $ 308.46) of the rental house for 1985. In conclusion, we sustain respondent's determinations that petitioners' allowable depreciation is $ 308 for the house property and zero for the church property for 1985, and $ 617 for the house property and zero for the church property for 1986. Respondent's recomputation of these deductions was reasonable, and petitioners failed to persuade us otherwise. Issue *717 5. Gambling Losses for 1985
The fifth issue is whether petitioners are entitled to claimed gambling losses of $ 9,870 for 1985. Respondent disallowed these losses for lack of substantiation. On petitioners' 1985 income tax return, they reported $ 117,896 as gambling income from one wager, and a $ 9,870 deduction, listed as "Loss & Expenses on American Express & Visa". Section 165(d) provides that "Losses from wagering transactions shall be allowed only to the extent of the gains from such transactions". See also sec. 1.165-10, Income Tax Regs. The burden of proof is on the taxpayers to establish the amount of their gambling losses. Rule 142(a); Norgaard v. Commissioner, 939 F.2d 874 (9th Cir. 1991), affg. in part and revg. in part T.C. Memo. 1989-390; Stein v. Commissioner, 322 F.2d 78, 82 (5th Cir. 1963), affg. T.C. Memo. 1962-19; Schooler v. Commissioner, 68 T.C. 867, 869 (1977). The issue is factual and must be decided on the evidence presented. Green v. Commissioner, 66 T.C. 538, 544 (1976). *718 Section 6001 requires taxpayers to keep adequate records to substantiate their income and deductions. See also sec. 1.6001-1(a), Income Tax Regs. However, there is no ironclad formula for determining what records should be deemed sufficient to prove losses under section 165(d). See Green v. Commissioner, supra at 548. Petitioners did not maintain any records of petitioner's 1985 gambling losses. At trial, petitioner stated that at one time he had racing programs but he did not save these forms. Petitioner did not present any racing tickets to show when or how much he wagered in 1985 and did not present any witnesses to corroborate the claimed losses. It appears from the record that petitioners intermingled petitioner's gambling expenses and claimed losses for 1985. Expenses of a casual gambler for temporary living accommodations, travel, and food are personal expenses, and therefore are not deductible. See sec. 262. There is no evidence in the record as to what portion of the claimed deduction constituted expenses as opposed to losses. Where a taxpayer fails to keep adequate records of winnings and losses, absent credible evidence otherwise, *719 claimed gambling losses have been held to be nondeductible. See, e.g., Norgaard v. Commissioner, supra; Stein v. Commissioner, supra.
However, it is a truism that no one ever bets enough on winning horses, but too much on losing horses. In these circumstances we think that in order to win $ 117,896, petitioner must have had some gambling losses. Thus, we will invoke the rule of Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930), affg. in part and revg. in part 11 B.T.A. 743 (1928), and we will allow petitioners some gambling losses for 1985. See also Drews v. Commissioner, 25 T.C. 1354 (1956). Because petitioners' lack of adequate records and their intermingling of losses and expenses prevents us from determining the precise amount of these losses for 1985, we will bear heavily against petitioners for their inexactitude and make as close an approximation as we can. Consequently, we hold that they are entitled to a $ 2,000 deduction for gambling losses in that year and are not entitled to their remaining *720 claimed losses. Issue 6. Gambling Income and Losses for 1986
The sixth issue is whether petitioners received unreported gambling income of $ 49,140 in 1986 (and, as a result, are also entitled to $ 14,233 of additional gambling losses for that year). Petitioners argue that they reported all of their 1986 gambling income. Respondent, on the other hand, contends that petitioners underreported the gambling income on their 1986 return. Petitioners reported a total of $ 47,550.20 as gambling winnings on their 1986 income tax return from one racetrack, Louisiana Downs, Inc., and deducted $ 47,550.00 as gambling losses for the year. They attached four separate Forms W-2G to their 1986 return to evidence the winnings. A taxpayer is required to maintain adequate books and records in order to file a correct return. Sec. 1.6001-1(a), Income Tax Regs. The Commissioner is authorized to reconstruct a taxpayer's income if the taxpayer fails to maintain such records. Sec. 446(b). The method of reconstruction must be reasonable. The Commissioner's determination is presumed correct unless proved to be arbitrary and excessive. Helvering v. Taylor, 293 U.S. 507 (1935). *721 We think respondent's reconstruction of petitioners' 1986 gambling winnings was arbitrary and excessive. Despite petitioners' incomplete records, we hold that respondent's reconstruction of petitioners' gambling income for 1986 lacked a reasonable basis. As stated in the Findings of Fact, respondent determined that petitioner placed over 22,000 bets on 152 days in 1986 at five racetracks. Respondent recomputed petitioners' 1986 gambling income to account for additional winnings at the racetracks. Respondent made the computation by assuming that the ratio of wagering losses at Louisiana Downs, Inc., to income reported on the W-2G Forms from Louisiana Downs, Inc., reflected the same ratio of wagering losses to income received from all racetracks, including Louisiana Downs, Inc. (see supra note 6). Respondent thus projected and determined that petitioners had unreported gambling income of $ 49,140 for 1986 in addition to the $ 47,550.20 that they reported. Because the claimed wagering losses were used as a basis to recompute income, respondent also increased petitioners' allowable losses by $ 14,233. We do not sustain this recalculation. Respondent's reconstruction of petitioners' *722 1986 gambling income was simply conjectural, with no reasonable basis. It was also excessive. Accordingly, we hold that petitioners correctly stated their gambling income and losses on their 1986 return. Issue 7. Schedule W Married Couple Deduction
The seventh issue is whether petitioners are entitled to Schedule W married couple deductions for 1985 and 1986 in the respective amounts of $ 1,336 and $ 675. In 1985 and 1986, Carolyn J. Stafford earned wages from American Airlines, Inc., and petitioner received income from his gasoline stations and from other sources. During 1985 and 1986, section 221 allowed, in the case of a joint return, a deduction for two-earner married couples equal to 10 percent of the lesser of $ 30,000 or the "qualified earned income" of the spouse with the lower qualified earned income for the taxable year. Qualified earned income was further defined as an amount equal to the excess of (a) the earned income of the spouse for the taxable year, over (b) an amount equal to the sum of certain deductions allowable under section 62 and properly allocable to or chargeable against earned income. Sec. 221(b). In view of our holdings in issues 2 and 3, *723 petitioners' gasoline service station income is increased; thus, petitioners' qualified earned income is correspondingly affected. Because this issue is computational, it can be resolved in the Rule 155 computations. Issue 8. Investment Credits
The eighth issue is whether petitioners are entitled to investment credits of $ 17,570 for 1985. Respondent contends that petitioners are not entitled to these credits. Petitioners contend otherwise. On their 1985 return, petitioners claimed $ 17,570 in investment credits with respect to buildings located on the church property, the house property, and the Dallas Phillips 66 Station property. Section 38 provides a credit against tax for investments in certain types of property, described as "section 38 property". In relevant part, section 48 defines section 38 property as follows: Sec. 48 Definitions; special rules. (a) SECTION 38 PROPERTY. -- (1) IN GENERAL. Except as provided in this subsection, the term "section 38 property" means - (A) tangible personal property (other than an air conditioning or heating unit), or (B) other tangible property (not including a building and its structural components) but only if such property *724 -- * * * (E) in the case of a qualified rehabilitated building, that portion of the basis which is attributable to qualified rehabilitation expenditures (within the meaning of subsection (g)), or * * * Buildings are generally not section 38 property and, therefore, do not qualify for the investment credit. See sec. 1.48-1(e), Income Tax Regs.; see also sec. 1.48-1(c), Income Tax Regs. ("tangible personal property" does not include "land and improvements thereto, such as buildings or other inherently permanent structures"). As a result, only "qualified rehabilitation" buildings are eligible for the investment credit. Petitioners have not submitted any evidence to show that the buildings on the three properties met the requirements of qualified rehabilitation buildings. We therefore sustain respondent on this issue. Issue 9. Self-Employment Tax
The ninth issue is whether petitioners are liable for increased self-employment taxes pursuant to section 1401 for 1985 and 1986 in the respective amounts of $ 4,563 and $ 3,816. Petitioners contend that they properly calculated their self-employment taxes on their returns. Respondent argues to the contrary. Section 1401 *725 imposes a tax upon net earnings from self-employment. The term "net earnings from self-employment" is defined as gross income derived by an individual from any trade or business carried on by such individual, less the deductions attributable to such trade or business. Sec. 1402(a). Petitioners bear the burden of proving that respondent's determination is erroneous. Rule 142(a). The self-employment income currently at issue was generated by the additional income (and decreased by the additional allowable expenses) from petitioners' gasoline service station businesses. In view of our conclusions with respect to issues 2 and 3, as well as petitioners' failure to offer any evidence on this issue, we hold that petitioners are liable for the additional self-employment taxes determined by respondent. Issue 10. Additions to Tax for Negligence
The tenth issue is whether petitioners are liable for the additions to tax for negligence or intentional disregard of rules or regulations pursuant to section 6653(a)(1) and (2) for 1985, and section 6653(a)(1)(A) and (B) for 1986. Petitioners contest respondent's determination that they are liable for these additions to tax. Sections *726 6653(a)(1) and 6653(a)(1)(A) impose an addition to tax if any part of an underpayment of tax is due to negligence or intentional disregard of rules or regulations. Sections 6653(a)(2) and 6653(a)(1)(B) impose an additional amount, but only with respect to the portion of the underpayment attributable to the negligence. Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Respondent's determination of negligence is presumed to be correct and petitioners have the burden of proving that it is erroneous. Rule 142(a); Luman v. Commissioner, 79 T.C. 846, 860-861 (1982). It is clear from the record that petitioners were negligent in 1985 and 1986. They did not report all of their gross income from the gasoline service station businesses, and they also claimed a variety of unsubstantiated and erroneous deductions and credits. In addition, petitioners failed to maintain books and records of their income as required by section 6001 and section 1.6001-1, Income Tax Regs. See Schroeder v. Commissioner, 40 T.C. 30, 34 (1963). *727 Petitioner was aware of this obligation to make and keep records of his income-producing activities and expenses. He had operated gasoline stations since 1972 and prepared his own Federal income tax returns. Despite operating largely on a cash basis, he failed to keep receipts, cash register tapes, or other records regarding his cash sales. Similarly, petitioner did not maintain records of his gambling activities other than the totes from 1986. As a result, with the exception of the few issues where we have adjusted respondent's determinations, petitioners have failed to show that any part of their determined deficiencies was not due to negligence or intentional disregard of the rules. Accordingly, we hold that they are liable for the negligence additions to tax except, as to sections 6653(a)(2) and 6653(a)(1)(B), to the extent applicable to the 1985 and 1986 determinations that we have not upheld. Issue 11. Additions to Tax for Substantial Understatements
The final issue is whether petitioners are liable for the section 6661 additions to tax for substantial understatements of tax for 1985 and 1986. Respondent determined that petitioners are liable for the additions *728 to tax. Petitioners contest this determination. Section 6661(a) provides for an addition to tax if there is a substantial understatement of income tax. The amount of the section 6661 addition to tax for additions assessed after October 21, 1986, is equal to 25 percent of the amount of any underpayment attributable to a substantial understatement. Omnibus Budget Reconciliation Act of 1986, Pub. L. 99-509, sec. 8002, 100 Stat. 1951; Pallottini v. Commissioner, 90 T.C. 498, 501-502 (1988). An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1)(A). The understatement is reduced if it is based on substantial authority or is adequately disclosed on the return or in a statement attached to the return. Sec. 6661(b)(2)(B). It is clear that petitioners failed to report the minimal amount required by section 6661. Further, petitioners' understatements for 1985 and 1986 were neither based on substantial authority nor adequately disclosed on their returns or in a statement attached to their returns. We therefore sustain respondent's section 6661 determinations. *729 To reflect the parties' concessions and our conclusions on the disputed issues, Decision will be entered under Rule 155. Footnotes
*. On August 13, 1992, this Court filed its Memorandum Findings of Fact and Opinion (T.C. Memo. 1992-459) in this case. On October 16, 1992, respondent filed a motion requesting that the opinion be withdrawn and refiled because petitioner Clyde E. Stafford had filed on August 3, 1992, a Chapter 13 bankruptcy petition with the U.S. Bankruptcy Court, Northern District of Texas, Dallas Division. Consequently, pursuant to 11 U.S.C. sec. 362(a)(8) (1988), the proceedings in this Court with respect to petitioner Clyde E. Stafford were automatically stayed on August 3, 1992, thus nullifying our opinion filed August 13, 1992. An order was filed on September 28, 1992, dismissing the bankruptcy case, thus lifting the automatic stay of proceedings in this case. By order dated October 21, 1992, respondent's motion to withdraw T.C. Memo. 1992-459 was granted, and the opinion was withdrawn. Therefore our Memorandum Findings of Fact and Opinion is unchanged.↩
1. For 1986, the additions to tax for fraud are codified under sec. 6653(b)(1)(A) and (B).↩
1. Unless indicated otherwise, all section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Prior to trial, petitioners filed a second amendment to petition that raised the issue of whether the statute of limitations barred the assessment and collection of their 1985 deficiency and additions to tax. Respondent contested this issue in an answer to second amendment↩ to petition. This issue was properly raised pursuant to Rule 41(a), and we accordingly address it herein.
1. Petitioners claimed a total of $ 3,880 in business expenses for utilities and telephone for 1985. This amount included charges for both business and personal use. Similarly, for 1986, petitioners claimed a total $ 6,768 business expense for utilities and telephone that also included business and personal use. The parties have agreed on a $ 3,394.50 expense for 1986. See infra↩.
3. Respondent tested this amount for reasonableness by calculating the number of inspection stickers that petitioner purchased during 1985 ($ 1,127 total purchase price divided by $ 2.75 price per sticker) and then dividing this number into the projected income figure of $ 3,108. This resulted in an average income amount of $ 7.58 from each inspection sticker. For a regular State motor vehicle inspection, petitioners charged $ 7.50 for cars that used leaded fuel and $ 10.50 for cars that used unleaded fuel.↩
4. Petitioner provided the markup percentages to respondent at a 1987 meeting.↩
5. These amounts are relevant to our disposition of issue 1 supra↩ because in this context "gross receipts" is equated with "gross income".
6. Respondent computed petitioners' additional gambling income as follows: respondent totaled petitioners' claimed losses of $ 30,838 from Louisiana Downs, Inc. (taken from the racing tickets petitioners provided), and divided that amount by the total Forms W-2G income of $ 47,550.20, to arrive at 63.898 percent. (Respondent incorrectly calculated this percentage: 30,838 divided by 47,550.20 actually yields 64.854 percent). Respondent then divided petitioners' $ 61,783 of claimed losses from all racetracks (as shown on petitioners' 1986 return) by 63.898 percent, to project income of $ 96,690 from all racetracks. Thus, according to respondent's computations, petitioners understated their 1986 gambling income by $ 49,140 ($ 96,690 total reconstructed income minus $ 47,550.20 reported income).↩
7. Applying the sec. 6501(e)(1)(A) definition of gross income, petitioners reported gross income of $ 900,789 for 1985. Twenty-five percent of $ 900,789 is $ 225,197. Respondent reconstructed petitioners' 1985 gross income to be $ 1,132,409. Thus, petitioners omitted $ 231,620 of income from their 1985 return ($ 1,132,409 minus $ 900,789). This unreported, omitted income exceeds $ 225,197, which equals 25 percent of the gross income that petitioners reported on their 1985 return.↩
8. We note that at trial, E.W. Switzer, owner of Switzer's Petroleum Products, testified on behalf of respondent regarding his sales of S & S Petroleum, Inc., to petitioner. Also, two revenue agents, Gaynelle Schroeder and Lynette Harms, who worked on petitioners' audit, testified as to their reconstruction of petitioners' Schedules C gross receipts. All three individuals were credible witnesses.↩
9. For example, petitioner argued that he provided customers with a 4-cent discount for cash purchases and therefore his 1985 and 1986 gross receipts should be decreased due to the cash discounts. However, he was unable to produce any evidence to substantiate this contention. Also, we were not persuaded by the testimony of petitioner or his witness regarding the amount of the specialty repair income.↩
10. The proper treatment of the funds petitioners paid with regard to the station's underground storage tanks is discussed infra↩.
11. These expenses are listed in detail in our Findings of Fact.↩
12. While we note that the building on the church property may have had some value at this time, the record provides no evidence to support any allowance. See Williams v. United States, 245 F.2d 559, 560 (5th Cir. 1957); Vanicek v. Commissioner, 85 T.C. 731, 742-743↩ (1985).
13. Petitioners have offered no proof to contradict this determination.↩